M. Gregory Weisz, WSB No. 6-2934
Dustin J. Richards, WSB No. 7-4971
Crystal D. Stewart, WSB No. 7-6057
PENCE AND MACMILLAN LLC
P.O. Box 765
Cheyenne, WY 82003
5908 Yellowstone Road
Cheyenne, WY 82009
Phone: 307-638-0386
Fax: 307-634-0336
gweisz@penceandmac.com
drichards@penceandmac.com
cstewart@penceandmac.com

Gregory J. Krock (*Pro Hac Vice*)
Alexander M. Madrid (*Pro Hac Vice*)
Allison L. Ebeck (*Pro Hac Vice*)
MᴄGUIREWOODS LLP
Tower Two–Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222–3142
Phone: (412) 667–6000
Fax:  (412) 667–6050
gkrock@mcguirewoods.com
amadrid@mcguirewoods.com
aebeck@mcguirewoods.com

Attorneys for Defendant Carbon Creek Energy, LLC

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| GREGG B. COLTON, on behalf of himself and a class of similarly situated persons, | ) ) ) | |
| Plaintiff, | ) ) | Docket No. 2:22–cv–00150–ABJ |
| v. | ) ) | |
| CARBON CREEK ENERGY, LLC, | ) ) | |
| Defendant. | ) ) | |

---

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

---

Defendant Carbon Creek Energy, LLC ("Carbon Creek"), by and through its undersigned attorneys, and in accordance with Rule 23 of the Federal Rules of Civil Procedure, submits the within memorandum of law in opposition to Plaintiff's Motion for Class Certification.

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 3

    A.     The Manner in Which Carbon Creek Remits Payments to Royalty, Overriding Royalty, and Working Interest Owners ................................................................. 3

    B.     The Royalty Act's Provisions Regarding the Deadlines for Payment ................... 5

    C.     Colton's Proposed Class ........................................................................................ 6

ARGUMENT ................................................................................................................... 7

    A.     The Court Cannot Determine That Carbon Creek Remitted "Late" Payments to Each Putative Class Member By Answering a Single Common Question ............ 8

        1.     The Court Must Analyze Each Payment to Determine Whether Its Timing Was Affected by a Prior Period Adjustment ................................................. 9

        2.     The Court Must Examine Each Supposedly "Late" Payment to Determine Whether It Exceeded the Royalty Act's $100 Threshold ......................... 12

        3.     The Court Must Examine Each Working Interest Owners' Account to Determine Whether the Payment Was Subject to JIB Netting ................. 13

        4.     The Court Must Examine the Circumstances Surrounding Each Payment to Determine Whether Carbon Creek "Knew" It Was Late ..................... 15

    B.     Colton Has Not Demonstrated That His Overriding Royalty Interests Render Him a Typical Class Member ...................................................................................... 18

    C.     The Individualized Circumstances Surrounding Each Payment Will Predominate Over Carbon Creek's Common Protocol for Remitting Payments ...................... 18

    D.     The Oklahoma Court's Ruling in *Cline v. Sunoco* Demonstrates That Class Certification Is Inappropriate in this Case ........................................................... 21

    E.     The Motion Fails as a Matter of Law Because Porter's Proffered Expert Opinion Is Unreliable and Inadmissible .......................................................................... 24

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraham v. WPX Production Productions, LLC*,
    317 F.R.D. 169 (D.N.M. 2017)................................................................................15

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997)..............................................................................................20

*Anderson Living Trust v. WPX Energy Prod., LLC*,
    306 F.R.D. 312 (D.N.M. 2015).....................................................................8, 10, 11

*In re Arabella Petroleum Co., LLC*,
    647 B.R. 851 (Bankr. W.D. Tex. 2022)...................................................................14

*Belmont v. BP Am. Prod. Co.*,
    No. 13–CV–0063, 2015 WL 11019026 (D. Wyo. Jan. 8, 2015) ..................................3, 10, 11

*In re Blood Reagents Antitrust Litig.*,
    783 F.3d 183 (3d Cir. 2015)....................................................................................24

*Cities Servs. Oil & Gas Corp. v. State*,
    838 P.2d 146 (Wyo. 1992)..................................................................................6, 15

*Cline v. Sunoco, Inc. (R&M)*,
    333 F.R.D. 676 (E.D. Okla. 2019) ...............................................................2, 21, 22, 23

*Cline v. Sunoco, Inc. (R&M)*,
    No. 22–7018, 2023 WL 4946312 (10th Cir. Aug. 3, 2023)....................................21

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).....................................................................................18, 20, 25

*In re ConAgra Foods, Inc.*,
    302 F.R.D. 537 (C.D. Cal. 2014) ............................................................................25

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)................................................................................................24

*DDR Weinert, LTD v. Ovintiv USA, Inc.*,
    No. 22–CV–00558, 2023 WL 4054600 (W.D. Tex. June 16, 2023) ......................10

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*,
    No. 17–MD–2785, 2020 WL 1164869 (D. Kan. Mar. 10, 2020) ............................24

*Foster v. Merit Energy Co.*,
    282 F.R.D. 541 (W.D. Okla. 2012)................................................................16, 20

*Hicks v. Sw. Energy Co.*,
    330 F.R.D. 183 (E.D. Ark. 2018).........................................................................18

*King v. Kansas City S. Indus., Inc.*,
    519 F.2d 20 (7th Cir. 1975) ..................................................................................7

*In re Med. Waste Servs. Antitrust Litig.*,
    No. 2:03–MD–1546, 2006 WL 538927 (D. Utah Mar. 3, 2006)......................19, 20

*In re Pharmacy Benefit Mgrs. Antitrust Litig.*,
    No. 03–4730, 2017 WL 275398 (E.D. Pa. Jan. 18, 2017) ....................................25

*Prantil v. Arkema France S.A.*,
    No. 17–cv–02960, 2022 WL 1570022 (S.D. Tex. May 18, 2022) ........................24

*Rector v. City & County of Denver*,
    348 F.3d 935 (10th Cir. 2003) .............................................................................18

*Riedel v. XTO Energy, Inc.*,
    257 F.R.D. 494 (E.D. Ark. 2009).........................................................................20

*Stirman v. Exxon Corp.*,
    280 F.3d 554 (5th Cir. 2002) ...............................................................................18

*Wal–Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).....................................................................................7, 8, 9

*Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*,
    725 F.3d 1213 (10th Cir. 2013) ....................................................................7, 8, 19

*Weiner v. Snapple Bev. Co.*,
    No. 07–8742, 2010 WL 311952 (S.D.N.Y. Aug. 5, 2010) ....................................25

**Statutes**

Wyo. Stat. Ann. § 30–5–301(a) .................................................................................5, 6, 23

Wyo. Stat. Ann. § 30–5–301(b).................................................................................12, 13

Wyo. Stat Ann. § 30–5–304(a)(viii) ................................................................................23

**Other Authorities**

Land & Water L. Rev. 823 (1996)....................................................................................15

## <u>INTRODUCTION</u>

In this lawsuit, Plaintiff Gregg B. Colton ("Colton") alleges that Carbon Creek failed to include interest at a rate of 18% per annum on all purportedly "late" payments that it remitted under the Wyoming Royalty Payment Act (the "Royalty Act").  To obtain class certification, Colton must demonstrate that identifying the supposedly "late" payments can be accomplished on a class–wide basis without resorting to "mini–trials" regarding the deadline for each payment.  In an attempt to do so, Colton relies exclusively on one of the Royalty Act's deadlines.  Colton contends that, because one section in the Royalty Act states that the operator shall remit payment within 60 days after the end of the calendar month in which it sold the production, only two dates are required to identify "late" payments:  the date of sale and date of payment.  In other words, Colton contends any payment that Carbon Creek did not remit within the 60–day period was "late."

While superficially appealing, this contention is false.  Colton ignores the fact that the Royalty Act contains multiple exceptions to the 60–day deadline.  The Royalty Act states that the deadline does not apply if the parties entered into a signed contract containing other payment periods or arrangements.  The Royalty Act also states that the 60–day deadline does not apply if the owner's share of the well's production does not exceed $100 — in that case, the operator can withhold payment until the owner's aggregate share of the well's production exceeds the $100 threshold.  In addition, Carbon Creek is entitled to (1) make retroactive adjustments to previously–issued payments, which affects the timing and amount of a current payment, and (2) withhold payments from working interest owners who have failed to remit their share of the well's costs. For these reasons, the date on which Carbon Creek must pay one owner for gas sold during a particular month frequently differs from the date on which it must pay a different owner for gas sold during that very same month.

Accordingly, this Court must do far more than simply compare two dates on a spreadsheet to ascertain whether Carbon Creek remitted a late payment. The Court must determine whether a contract existed that affected the date on which the payment was due. In addition, the Court must ascertain whether the owner's share of the well's production exceeded the $100 threshold. The Court must also determine whether Carbon Creek was making retroactive adjustments to previously–issued payments. For example, if Carbon Creek obtained information which revealed that it had overpaid certain owners in the past, it might elect to withhold or reduce future payments to recoup the overpayments. Finally, even if no exception to the 60–day deadline applied, the Court must determine whether a payment was *in fact* made within 60 days (as checks that Carbon Creek mails are sometimes not cashed or otherwise returned as undeliverable).

In support of class certification, Colton relies almost exclusively on *Cline v. Sunoco*, an ongoing lawsuit involving an Oklahoma royalty statute (not yet tested on appeal) in which the court certified a class. But Colton overlooks critical distinctions between his proposed class and the class certified in *Cline.* In *Cline*, the plaintiff agreed to exclude from the class all payments that did not exceed the $100 threshold. In *Cline*, the plaintiff agreed to exclude all payments that involved prior period adjustments. In *Cline*, the statute did not govern payment to working interest owners, such that offsets from working interest owners who failed to remit their share of the well's costs were not at issue. Importantly, the operator in *Cline* not only admitted to knowingly remitting late payments, but maintained summary documents which identified those late payments.

In contrast, Colton has not excluded from the class all payments that would not exceed the $100 threshold. Colton has not excluded payments involving prior period adjustments. Colton has not excluded payments to working interest owners. And importantly, Carbon Creek *does not* possess summary documents which would enable the Court to exclude those payments. To

2

determine whether Carbon Creek remitted any "late" payments under the Royalty Act, the Court would have to conduct an exhaustive payment–by–payment analysis.

In fact, this Court refused to certify a class in 2015 in a dispute involving the failure to include interest on supposedly "late" payments under the Royalty Act. The Court concluded that "a determination of improper royalty payments and resulting royalty payment deficiencies" implicates a "variety of individualized issues" that "defeats the Court's ability to certify a class[.]" *Belmont v. BP Am. Prod. Co.*, No. 13–CV–0063, 2015 WL 11019026, *10–11 (D. Wyo. Jan. 8, 2015). In fact, no court has ***ever*** certified a class alleging uniform liability under any state's royalty payment statute for allegedly "late" payments because — in order to ascertain whether a payment is "late" — the court would have to examine the specific circumstances surrounding that payment. Colton offers no reason to deviate from this Court's well–reasoned decision in *Belmont* or the other cases in accord. Accordingly, the Court should deny Colton's motion for class certification.

## FACTUAL BACKGROUND

**A.   The Manner in Which Carbon Creek Remits Payments to Royalty, Overriding Royalty, and Working Interest Owners**

Since February 2016, Carbon Creek has operated approximately 5,500 different natural gas wells in Wyoming. *See* Objections and Responses to Plaintiff's First Request for Production of Documents, Interrogatories, and Requests for Admission (the "Discovery Responses"), excerpts of which are attached hereto as Exhibit A, at Interrogatory No. 1. Carbon Creek has remitted payments to more than 1,500 royalty, overriding royalty, and working interest owners for their share of the production from the wells. *See id.*

When it remits payments, Carbon Creek periodically engages in a standard industry practice of making "prior period adjustments" or "PPAs." Declaration of David T. Martineau ("Martineau Decl."), a copy of which is attached hereto as Exhibit B, at ¶ 3. It is common in the

3

industry for the well operator to remit a timely payment, but subsequently adjust that payment based on new information — such as metering problems, sales price adjustments, drilling unit modifications, or identification of an accounting error — that was not available when it remitted the initial payment. *Id.* at ¶ 4. Sometimes, Carbon Creek makes a PPA to supplement the initial payments that it remitted to the royalty, overriding royalty, or working interest owners. *Id.* at ¶ 5. Other times, Carbon Creek makes a PPA to "debit" to their accounts to correct prior overpayments that Carbon Creek remitted. *Id.* If an overpayment for a prior month's sale exceeded the amount that would be due for the owner's share of the production for the current payment month, Carbon Creek may not remit any payment to the owner until the overpayment has been fully recouped. *Id.* at ¶ 6. Accordingly, any such payment would not be "late."

The payments that Carbon Creek remits to working interest owners can differ from payments to royalty and overriding royalty interest owners. *Id.* at ¶ 7. Unlike royalty and overriding royalty interest owners, who typically receive payment for a share of the production that is free of the costs of production, working interest owners must pay a portion of those costs. *Id.* Carbon Creek enters into operating agreements with working interest owners, known as "Joint Operating Agreements" or "JOAs," that govern the manner in which Carbon Creek will operate the wells for the benefit of the working interest owners. *Id.* at ¶ 8. Among other terms, the JOAs set forth the manner in which (1) the working interest owners will remit payment for their share of the costs associated with drilling and operating the wells and (2) Carbon Creek will pay the working interest owners for their share of the production. *Id.* at ¶ 9. The JOAs require Carbon Creek to send each working interest owner a "Joint Interest Bill" for its proportionate share of the well's costs. *Id.* If the working interest owner does not timely remit payment, the JOAs authorize Carbon Creek to withhold future payments that would otherwise be owed to that working interest

4

owner in order to ensure that the owner pays its share of the costs.  *Id.* at ¶ 10.  This process is sometimes referred to as "JIB netting."  *Id.*

Maintaining current addresses for payments to royalty and overriding royalty owners can be challenging for well operators like Carbon Creek.  *Id.* at ¶ 11.  Although those owners are required to notify Carbon Creek if their addresses change, many owners forget to provide the required notice.  *Id.* at ¶ 12.  It is not unusual for the post office to return as "undeliverable" checks that Carbon Creek mailed to royalty and overriding royalty owners.  *Id.*  Similarly, Carbon Creek does not always receive prompt notice when royalty and overriding royalty owners transfer their interest (including when the owners pass away).  *Id.* at ¶ 13.  It is not uncommon for Carbon Creek to mail payments to the former owner for months before that owner, or a representative of that owner's estate, advises Carbon Creek to reissue the payments to the new owner of that interest. *Id.*  Finally, it is not unusual for some owners (particularly those with small interests) to lose or otherwise neglect to cash their checks.  *Id.* at ¶ 14.  Those owners periodically request that Carbon Creek void a previously–issued check and issue a replacement check.  *Id.*

**B.      The Royalty Act's Provisions Regarding the Deadlines for Payment**

The Royalty Act addresses the time periods in which an operator must remit payments to persons and entities who own an interest in the production from the operator's wells.  After making the initial payment, the operator must remit subsequent payments "not later than sixty (60) days after the end of the calendar month within which subsequent production is sold, ***unless other periods or arrangements for the first and subsequent payments are provided for in a valid contract with the person or persons entitled to such proceeds***."  Wyo. Stat. Ann. § 30–5–301(a) (emphasis added).  Thus, the 60–day deadline does not apply if the owner and operator are parties to a written contract that contains other time periods or payment arrangements.    *Id*.

In addition, a different payment deadline exists "if the total amount owed is one hundred dollars ($100) or less." *See id*. § 30–5–301(b)(i). If the owner's share of the well's production does not exceed the $100 threshold, then "[p]ayments shall be remitted to the person or persons entitled to proceeds from production annually for the aggregate of up to twelve (12) months accumulation of proceeds[.]" *Id*. In other words, the operator is not required to remit payment until (1) the owner's aggregate share of the well's production exceeds $100, or (2) the share still does not exceed $100 but has been accumulating for 12 months. *Id*.

If an operator does not remit a payment within the applicable time period, the payment is "late" under the Royalty Act. The penalty for late payment is "interest at the rate of eighteen percent (18%) per annum on the unpaid principal balance from the due date[.]" *Id*. § 30–5–303(a). Importantly, the Wyoming Supreme Court has held that an operator is only required to include the penalty interest with a payment if that payment is ***knowingly*** late. *See Cities Servs. Oil & Gas Corp. v. State*, 838 P.2d 146, 156 & n.10 (Wyo. 1992) (citing prior decisions).[1]

## C.  Colton's Proposed Class

In this lawsuit, Colton has moved to certify a class consisting of all persons or entities who "received late payments from Carbon Creek at any time since July 12, 2014" and did not receive a statutory interest payment. *See* Plaintiff's Motion for Class Certification (ECF No. 46) at p. 2. Colton offers no definition of "late payments" in his motion. *See id*. However, the definition that Colton utilizes can be gleaned from the report submitted by his expert, Royce Porter ("Porter"), in support of class certification.

---

[1] No court has ever held that offsetting or recoupment, such as through PPAs or JIB netting, constitutes a knowing failure to pay an amount to which an owner is legally entitled. *Cf.* Wyo. Stat. Ann. § 30–5–301(a) (noting that the Royalty Act's deadlines only apply to payments to which the owner is "legally entitled").

In his analysis, Porter considered every single payment that Carbon Creek did not submit within 60 days after the end of the calendar month in which it sold the production to be "late," regardless of the Royalty Act's other deadlines or exceptions.  He deemed payments that Carbon Creek did not remit within the 60–day period to be "late" even though they did not exceed the $100 threshold.  He also deemed payments that Carbon Creek did not remit to working interest owners to be "late" even though those owners had failed to pay their share of the well's costs in accordance with their JOAs.  In addition, Porter considered PPAs that Carbon Creek made to previously–issued payments to be "new payments" that violated the Royalty Act.  In other words, when Carbon Creek followed the industry–standard practice of adjusting prior *timely* payments (often based on information not available at the time of the initial payment), Porter treated the adjustment as a "late" payment subject to the 18% penalty interest under the Royalty Act.

## ARGUMENT

Plaintiffs seeking class certification must prove, through a preponderance of the evidence that withstands "rigorous analysis," that their claims meet (1) each of the prerequisites set forth in Rule 23(a) of the Federal Rule of Civil Procedure and (2) one of the subparts contained in Rule 23(b).  *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1217 (10th Cir. 2013) (quoting *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)).  Because the plaintiff bears a "strict burden of proof" to demonstrate compliance with Rule 23, "[a] court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met."  *Id.* at 1218.[2]

---

[2] In his supporting brief, Colton cites 50–year old caselaw for the proposition that "Rule 23 must be liberally interpreted, and its policy is to favor maintenance of class actions."  Brief in Support of Plaintiff's Motion for Class Certification (the "Colton Brief"), ECF No. 47 at 9 (citing *King v. Kansas City S. Indus., Inc.*, 519 F.2d 20, 25–26 (7th Cir. 1975)).  But both the U.S. Supreme Court and the Tenth Circuit have since rejected the prior "liberal" stance towards Rule 23, the latter of

In this instance, Colton has not satisfied (and cannot satisfy) this rigorous burden. Colton fails to satisfy the commonality requirement in Rule 23(a)(2), the typicality requirement in Rule 23(a)(3), or the predominance and superiority requirements in Rule 23(b)(3). Each of these failures alone warrants the denial of class certification. Collectively, the failures present an insurmountable obstacle to the certification of Colton's prospective class.

**A.    The Court Cannot Determine That Carbon Creek Remitted "Late" Payments to Each Putative Class Member By Answering a Single Common Question**

To demonstrate commonality, Colton must prove that all class members' claims "depend upon a common contention" such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart*, 564 U.S. at 350. Contrary to the suggestion, Colton cannot meet his burden by identifying a "single question of law or fact common to the entire class." *See* Colton Brief at 10. The U.S. Supreme Court has made clear that "any competently crafted class complaint literally raises common questions." *Wal–Mart*, 564 U.S. at 349 (alterations and citation omitted). "[W]hat matters to class certification is not the raising of common 'questions' — even in droves — but rather, the capacity of a class–wide proceeding to generate ***common answers*** apt to drive the resolution of the litigation." *Id.* at 350 (emphasis added); *see also Roderick*, 725 F.3d at 1218 ("[T]he mere raising of a common question does not automatically satisfy Rule 23(a)'s commonality requirement. Rather, the common contention 'must be of such a nature that it is capable of ***classwide resolution*** . . . .'") (internal quotation omitted; emphasis added).

---

which has held that "district courts should apply a 'strict standard of proof' to class certification issues." *Anderson Living Trust v. WPX Energy Prod., LLC*, 306 F.R.D. 312, 376 n.38 (D.N.M. 2015) (explaining that prior decisions suggesting deference towards plaintiffs' allegations at the class certification stage are no longer good law).

For this reason, Colton cannot satisfy the commonality requirement by asserting that all putative class members "suffered a violation of the same provision of law." *Dukes*, 546 U.S. at 350. Colton must instead demonstrate that the Court's answer to a common question will "drive the resolution of the litigation." *See id.* Stated differently, Colton must prove that the Court can determine whether Carbon Creek remitted "late" payments to all class members "in one stroke" by resolving a single common issue related to their payments. *See id.*

Colton cannot do so. Nowhere in his supporting brief does Colton identify a common issue that the Court can resolve "in one stroke" that will prove Carbon Creek remitted "late" payments to all putative class members. The reason for this failure is transparent: to determine whether Carbon Creek timely remitted payments for each owner' share of the production sold during a particular month, the Court must determine (a) whether the payment would exceed the $100 threshold, (b) whether Carbon Creek made any PPAs that would affect the timing or amount of the payment, (c) whether Carbon Creek exercised its right to utilize JIB netting, and (d) whether any other any circumstances affected the issuance (or reissuance) of that payment.

### 1. The Court Must Analyze Each Payment to Determine Whether Its Timing Was Affected by a Prior Period Adjustment

Contrary to the assumption upon which Porter based his entire analysis, this Court cannot assume that each and every payment not remitted within 60 days is "late" under the Royalty Act. The Court must consider PPAs that might affect whether the owner is "legally entitled" to receive a payment. For example, if Carbon Creek obtained information to suggest that it overpaid an owner when it remitted payment for gas sold in one month, and withheld a portion of the owner's share of production sold during a subsequent month, that PPA — analyzed in isolation — could be misinterpreted as a "late" or "incomplete" payment for the production sold in the subsequent month. As a Texas court recently explained:

> When operators overpay on their wells, payors routinely recoup royalty overpayments through unilateral adjustments, off–sets, revenue rebooking, or otherwise withhold or debt a payee's future royalties until the overpaid amounts are collected.  Importantly, the parties agree that recoupment is a common and established practice in these industries.  . . .  [P]rior period adjustments occur frequently in the oil and gas industry and allow operators to pay out royalties in a timely manner with the flexibility to adjust for revised or updated information received at a later date.

*DDR Weinert, LTD v. Ovintiv USA, Inc.*, No. 22–CV–00558, 2023 WL 4054600, at *4 (W.D. Tex. June 16, 2023) (alterations omitted).

Because so many variables are relevant in assessing the timeliness of an owner's payment, then–Chief Judge Freudenthal refused to certify a class in *Belmont* in analogous circumstances. *Belmont*, 2015 WL 11019026, at *10–11.  The plaintiffs in *Belmont* sought to certify a class of owners in production from Wyoming wells who did not receive 18% penalty interest on "late" payments that the operator (BP) purportedly remitted under the Royalty Act.  *Id.* at *1.  This Court held that "individual inquiries would be required" to determine whether BP properly made permitted deductions in its payment calculations.  *Id.* at *8.  In refusing to certify the class because commonality was lacking, the Chief Judge explained:

> The statutory interest penalty only arises after a determination of improper royalty payments and resulting royalty deficiencies.  The variety of individualized issues relating to Permitted Deductions and Realized Proceeds defeats the Court's ability to certify the class for any actual interest penalty calculation. . . .

*Id.* at *10–11.

In *Anderson Living Trust*, the court similarly concluded that the prevalence of PPAs prevented the certification of a class seeking to recover from an operator accused of systematically underpaying royalties. *Anderson Living Trust*, 306 F.R.D. at 349.  The court noted that, "[e]very month, WPX Production makes numerous adjustments to prior royalty and overriding royalty payments in the form of 'prior period adjustments.'  Many circumstances can prompt prior–period adjustments, some of which are beyond WPX Production's control, including volume changes

from the gathering systems, suspense payments, and unit expansions." *Id.* at 348. For that reason, the court concluded that the PPAs prevented the plaintiff from establishing the commonality requirement under Rule 23(a)(2) or the predominance requirement under Rule 23(b)(3). The court emphasized that "the primary issue is how much the Plaintiffs should have been paid, and the Defendants' practices do not answer that question in a common way." *Id.* at 349.

Like other operators, Carbon Creek routinely utilizes PPAs when it receives new or updated information. Martineau Decl. at ¶ 3. Carbon Creek's expert witness, Quentin Mimms ("Mimms"), explained that "PPAs are common occurrences in oil and gas accounting as new information becomes available, and these adjustments often occur after a timely payment." *See* Expert Report of Quentin Mimms ("Mimms Report"), a copy of which is attached hereto as Exhibit C, at ¶ 31. If the Court were to examine only the date on which Carbon Creek issued a check to supplement a payment for production sold in a particular month, the analysis might suggest that Carbon Creek failed to make the initial payment on a timely basis. In fact, Mimms identified multiple examples in which Porter mistakenly concluded that Carbon Creek had remitted a "late" payment because he failed to review the owner's payment history and recognize that Carbon Creek had made a PPA to modify a prior timely payment. *See id.* at ¶ 20 (setting forth an example of an "on–time payment and adjustment that were not accounted for by Mr. Porter") and ¶ 22 (describing another example in which Porter failed to account for PPAs and erroneously concluded that a timely payment was "late"). Mimms noted: "Without an individualized and burdensome analysis, it is unclear how many other late payments Mr. Porter has identified for Mr. Stewart, Brown, or other owners that were actually on–time . . . ." *Id.* at ¶ 25.

In short, *Belmont* and *Anderson Living Trust* are on point. The fact that Carbon Creek utilizes PPAs to retroactively modify prior payments, which were timely remitted based on

information believed to be accurate at the time, reveals that determining whether a particular payment was "late" under the Royalty Act is a complicated analysis. This Court cannot determine "in a common way" whether Carbon Creek remitted "late" payments to each putative class member. Instead, the Court would have to undertake a payment–by–payment analysis to assess the PPAs and their impact on each payment's timeliness. For this reason, Colton cannot establish the commonality requirement under Rule 23(a)(2).

### 2. The Court Must Examine Each Supposedly "Late" Payment to Determine Whether It Exceeded the Royalty Act's $100 Threshold

As set forth above, the 60–day deadline set forth in Section 301(a) of the Royalty Act ***does not apply*** if the owner's share of a well's production does not exceed $100. Wyo. Stat. Ann. § 30–5–301(b). Section 301(b) expressly states that the operator need not remit payment until the aggregate amount of the owner's share of the well's production exceeds $100 (or the amounts have been accumulating for 12 months). *Id.* For example, if a royalty owner's share of the well's production that was sold in January was only $25, the operator would not be required to remit that payment within 60 days (by the end of March). If the owner's share of the production sold during each subsequent month was also $25, the aggregate amount of the owner's share of production would not exceed the $100 threshold for five months, when the production sold in May caused the aggregate amount of the owner's share to reach $125.

This $100 threshold renders it impossible to determine on a class–wide basis whether a particular payment was "late" under the Royalty Act. Contrary to Colton's suggestion in his brief, the Court cannot simply (1) compare the month of sale to the month of payment and (2) deem all payments not made within 60 days of sale to be "late." The Court must also consider the value of each owner's share of the production, as the date on which the payment is due is dependent upon that value. In his report, Mimms provided concrete examples of instances in which Porter's failure

to consider the $100 threshold resulted in mistaken conclusions that particular payments were "late" under the Royalty Act:

> Mr. Porter's methodology . . . fails to account for Section 30–5–301(b) of the WRPA. . . . An example of Mr. Porter's erroneous identification of late payments that fall within the $100 Threshold are the payments made to David J Foote. Mr. Porter's methodology identifies total late payments of $98.52 and corresponding interest owed of $5.08 to Mr. Foote. However, each of the late payments identified by Mr. Porter were for amounts less than the $100 Threshold, and Carbon Creek initiated payment to Mr. Foote when the $100 Threshold was met per the WRPA in May 2017[.] . . . ***Each interest owner must be evaluated individually to determine when the $100 Threshold is met and if any payments were not remitted on time under the WRPA.***

Mimms Report at ¶¶ 28–33 (emphasis added); *see also id.* at ¶ 31 (identifying "[a]nother example of Mr. Porter's erroneous identification of late payments that fall within the $100 Threshold[.]").

Porter's failure to address the $100 threshold was not an insignificant error. In reviewing his analysis, Mimms determine that ***more than one–half*** of the payments that Porter considered to be "late" did not exceed the $100 threshold and were therefore not untimely under the Royalty Act. *See id.* at ¶ 34. The magnitude of Porter's error underscores the importance of individually evaluating whether each owner's share of the well's production exceeded the $100 threshold.

### 3. The Court Must Examine Each Working Interest Owners' Account to Determine Whether the Payment Was Subject to JIB Netting

Because working interest owners are required to pay a portion of the costs associated with drilling and operating the wells, determining whether Carbon Creek paid them on time differs from the analysis applicable to royalty and overriding royalty interest owners (who do not share in those costs). The JOAs that govern payments to working interest owners authorize Carbon Creek to withhold payments to owners who have not remitted their proportionate share of the well's costs. As Mimms explained in his report:

> Working interest owners are obligated to pay their proportionate share of the drilling and completion costs, along with on–going operating expenditures necessary to continue production of oil and gas volumes. If a working interest

> owner fails to make a payment to Carbon Creek for those costs, Carbon Creek may be entitled under the JOA to withhold future payment of proceeds to cover those costs.
>
> These expenses are charged to working interest owners through a process called joint–interest–billing ("JIB"). JIB expenses can be netted from a working interest owners' proceeds each month to recoup the amount owed. When JIB expenses exceed revenues, the working interest owners do not receive a payment.

*Id.* at ¶¶ 36–37; *see also In re Arabella Petroleum Co., LLC*, 647 B.R. 851, 861 (Bankr. W.D. Tex. 2022) ("Mr. Crisp also testified that it is common industry practice for an operator to net the revenues earned on wells against the joint interest billings owed by that same working interest owner. . . . [T]he decision whether to do so is discretionary.").

For this reason, the fact that Carbon Creek did not remit a payment to a working interest owner within 60 days does not mean that the payment was "late." Carbon Creek may have withheld (or netted) the payment for those proceeds because the working interest owner had not timely paid its share of the well's costs. In fact, Colton acknowledged that JIB netting is a common industry practice. *See* Transcript of Deposition of Gregg B. Colton ("Colton Dep."), excerpts of which are attached hereto as Exhibit D, at 66. And Colton expressly disclaimed any claim for statutory interest related to payments that Carbon Creek offset due to JIB netting:

> Q:    In this lawsuit, are you taking issue at all with Carbon Creek's right to withhold payments to any working interest owner who might not have paid its pro rata share of the costs associated with a particular well?
>
> A:    I'm not taking issue.
>
> Q:    So if Carbon Creek did not pay a particular working interest owner in order to recover monies that that working interest owner had not paid as far as its pro rata share, you're not taking the position that – that the failure to remit a payment within 60 days to that working interest owner is a late payment, are you?
>
> A:    No.

*Id.* at 66–67.

For this reason, the Court cannot determine whether payments to working interest owners were "late" by answering one "common question." The Court must examine each working interest owner's JIB account to determine whether it had timely remitted its share of the costs associated with the wells in which it owns an interest. If not, the Court must determine whether Carbon Creek withheld payment (in whole or in part) in accordance with its rights under the JOAs. *See* Mimms Report at ¶ 40 ("I understand that there are numerous other working interest owners included in Mr. Porter's late payment analysis that are likely subject to the same issues. An individualized analysis is required to determine if any of these working interest owners are subject to the statutory payment terms."). Such an individual payment–by–payment analysis for each working interest owner defeats commonality.[3]

### 4.    The Court Must Examine the Circumstances Surrounding Each Payment to Determine Whether Carbon Creek "Knew" It Was Late

Because payment of statutory interest under the Royalty Act is a penalty, the Wyoming Supreme Court has held that the operator must "knowingly fail[] to pay" the proceeds to be "liable for eighteen percent per annum penalty interest for unpaid royalties pursuant to the Act." *Cities*, 838 P.2d at 156 & n.10 (citing prior decisions).[4] This requirement makes sense because an

---

[3] Colton contends that the fact that he does not own working interests is irrelevant because "differing ownership interests are immaterial under the WRPA." Colton Brief at 13. This contention is misguided. As demonstrated above, Carbon Creek might be required to remit payment to a royalty owner for its share of the well's production sold during a particular month but — as a result of Carbon Creeks' right to engage in JIB netting — might ***not*** be required to remit payment to a working interest owner for its share of the same well's production sold in that same month. For this reason, courts routinely reject certification of claims where the putative class contains different types of interest owners. *See, e.g., Abraham v. WPX Production Productions, LLC*, 317 F.R.D. 169, 261 (D.N.M. 2017) ("To determine whether the royalty agreements require payment on all production . . . the Court must ask the question as to each of the different lease forms. The question, therefore, is not common to all proposed class members.").

[4] *See also* Brandin Hay, *Wyoming's Royalty Payment Act*, 31 Land & Water L. Rev. 823, 832 (1996) ("A royalty interest owner must demonstrate the payor's knowledge of nonpayment of full royalties.").

operator cannot include penalty interest with its "late" payments unless it is aware that those payments are late. Accordingly, even if Carbon Creek had remitted late payments for gas sold during a particular month, the Court would have to analyze each payment to determine whether Carbon Creek ***knew*** it was late and should have proactively included the statutory penalty interest.

In *Foster v. Merit Energy Co.*, 282 F.R.D. 541 (W.D. Okla. 2012), another putative class action involving the alleged underpayment of royalties, the court rejected the plaintiff's attempt to circumvent the unique circumstances surrounding each payment by asserting that the operator acted "uniformly" in calculating its payments. *Id.* at 559–60. The court explained that "uniformity" does not satisfy the commonality requirement:

> [P]laintiff correctly asserts that Merit treats all Oklahoma royalty owners alike with respect to payment of royalties. That, on its face, appears to be a risky approach for Merit . . . . But the issue now before the court is whether the legality of Merit's treatment of its Oklahoma royalty owners may be adjudicated on a classwide basis. On the issue of commonality under Rule 23(a), ***uniform treatment of all royalty owners will not carry the day*** where that uniform treatment must be measured against . . . a wide range of variations with respect to potentially dispositive facts.

*Id.* (emphasis added). Because the court would need to make "class member–by–class member determinations as to which class members should also be permitted to recover, on the basis of ***their*** facts," commonality was absent. *Id.* at 560.

Like the plaintiff in *Foster*, Colton asserts that commonality exists because Carbon Creek had "uniform obligations" to owners of the gas produced from its wells and engaged in a "uniform failure to timely remit proceeds" that included penalty interest. Colton Brief at 12. Carbon Creek disputes that it engaged in any such "uniform failure." However, even assuming *arguendo* that Colton's assertion was true, it would be insufficient to satisfy the commonality requirement. Colton would still need to demonstrate that — if the Court answers a single question — that answer will determine whether Carbon Creek remitted "late" payments to each putative class member.

16

Because of the unique circumstances regarding Carbon Creek's issuance of checks, Colton cannot demonstrate that that Carbon Creek "knew" it was remitting late payments on a class–wide basis. Importantly, a payment may appear to be "late" if Carbon Creek timely issued a check, voided that check, and then reissued a new check. But Carbon Creek did not knowingly remit a late payment when it reissued the check. As set forth above, Carbon Creek often voids and reissues checks at the owner's request as a result of circumstances outside of Carbon Creek's control. In his report, Mimms identified such an example among the allegedly "late" payments that Porter believed to exist. Mimms Report at ¶¶ 53–57. In that example, Carbon Creek issued a check on April 29, 2022 as payment for gas sold in December 2021. Mimms explained that, "[a]ccording to Mr. Porter's methodology, the [payment amount of $5,750.41] would be considered late" because the check was issued outside of the 60–day period. *Id.* at ¶ 55. In reality, "[t]he check for $5,750.31 for the December 2021 production sales date was originally paid . . . on February 28, 2022" but "the check was returned to Carbon Creek due to a bad address causing the payment to be voided and reissued on the April 29, 2022 check." *Id.* at ¶ 56.

This example demonstrates that the Court cannot simply identify all checks issued more than 60 days after the month in which the gas was sold, assume that Carbon Creek "knowingly" failed to issue those check on time, and impose penalty interest on the amounts of those checks. The Court must instead scrutinize the circumstances surrounding each check, including whether Carbon Creek timely issued a check that was returned as undeliverable or otherwise reissued. *See* Mimms Report at ¶ 58 ("An individualized analysis is required for all owners with voided checks to determine the reason for a payment appearing late.").[5]

---

[5] Colton may respond that Carbon Creek was required to escrow the owner's share of the production upon receipt of a returned check. Such a response is a red herring. This lawsuit does not involve Carbon Creek's failure to escrow any monies following the return of timely–issued

**B.    Colton Has Not Demonstrated That His Overriding Royalty Interests Render Him a Typical Class Member**

In addition to commonaly, Rule 23(a)(3) requires Colton to demonstrate that his individual claim is "typical of the claims of the class members he seeks to represent." *Rector v. City & County of Denver*, 348 F.3d 935, 949–50 (10th Cir. 2003). Colton has failed to do so.

As an overriding royalty interest owner, Colton is not responsible for paying the costs of production associated with any wells that Carbon Creek operates. Colton and Carbon Creek are therefore not parties to any JOAs, Carbon Creek does not maintain a JIB account for Colton, and Carbon Creek does not engage in JIB netting with respect to Colton. For these reasons, Colton's interests are materially different than those held by working interest owners who are subject to JOAs with Carbon Creek. These differences render Colton an atypical class representative. *See Hicks v. Sw. Energy Co.*, 330 F.R.D. 183, 193 (E.D. Ark. 2018) (concluding that a plaintiff who held a different interest than other class members failed to satisfy the typicality requirement); *see also Stirman v. Exxon Corp.*, 280 F.3d 554, 563 (5th Cir. 2002) (holding the district court abused its discretion in certifying class because, by virtue of his execution of a different type of lease, the plaintiff was atypical of other class members).

**C.    The Individualized Circumstances Surrounding Each Payment Will Predominate Over Carbon Creek's Common Protocol for Remitting Payments**

Colton also fails to prove that "questions of law or fact common to class members predominate over any questions affecting only individual members" in accordance with Rule 23(b)(3). "If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Because Rule 23(b)(3) "is designed

---

checks. Instead, the lawsuit involves Carbon Creek's failure to proactively include penalty interest in the first instance when it knowingly remitted "late" payments under the Royalty Act.

for situations in which class–action treatment is not as clearly called for," the court has a "duty to take a 'close look' at whether common questions predominate over individual ones." *Id*. (internal quotations omitted). "[P]redominance may be destroyed if individualized issues will overwhelm those questions common to the class." *Roderick*, 725 F.3d at 1220; *see also In re Med. Waste Servs. Antitrust Litig.*, No. 2:03–MD–1546, 2006 WL 538927, at *3 (D. Utah Mar. 3, 2006) ("To meet the predominance requirement, a plaintiff must establish that the issues in the class action . . . are subject to ***generalized*** proof[.]") (quotation marks and citation omitted) (emphasis added).

Here, Colton's request for class certification does not survive such a "close look." The Court will have to examine each of the individualized issues set forth above with respect to each payment issued to each putative class member. Even though Carbon Creek might not have remitted a payment within 60 days after the last day of the month in which it sold the production, the Court will still need to assess:

- whether the timing or amount of the payment was affected by a prior period adjustment;

- whether the owner's share of the well's production exceeded the Royalty Act's $100 threshold;

- whether the owner held a working interest, and if so, whether Carbon Creek engaged in JIB netting under the appliable JOA to recoup or offset costs that the working interest owner had failed to remit; and

- whether Carbon Creek had previously attempted to issue the payment or otherwise reissued a new check due to circumstances outside of its control.

The consideration of each of these individualized issues **for *each payment that Carbon Creek remitted to each putative class member*** will be overwhelming. *See* Mimms Report at ¶ 19 (noting that "only an individualized analysis is capable of accurately identifying and quantifying potentially late payments and corresponding interest"). Accordingly, the Court's assessment of any common practices that Carbon Creek generally utilizes in remitting payments will not

predominate over the unique, individual questions that the Court will need to resolve in conjunction with each and every payment. Colton therefore cannot satisfy Rule 23(b)(3)'s predominate requirement. *See Riedel v. XTO Energy, Inc.*, 257 F.R.D. 494, 512 (E.D. Ark. 2009) (holding that predominance was not satisfied in class action involving underpayment of royalties because individual issues related to payment terms would predominate); *Foster*, 282 F.R.D. at 562 ("Although plaintiff relies heavily on the fact that Merit's royalty payment practices were uniform across the proposed class, that 'shared experience' cannot uncritically be found to satisfy the Rule 23(b)(3) predominance requirement because, given the greater number of questions peculiar to [individual class members], any overarching dispute about Merit's uniform royalty payment practice cannot satisfy the Rule 23(b)(3) predominance standard.") (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 623–24 (1997)) (cleaned up).[6]

Finally, Colton cannot satisfy the predominance requirement because his proffered damages model is fatally flawed. As the Supreme Court explained in *Comcast*, "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory." *Comcast*, 569 U.S. at 35. Where a model "falls far short of establishing that damages are capable of measurement on a classwide basis[,] . . . respondents cannot show Rule 23(b)(3) predominance[.]" *Id.* at 34. As set forth above, and described in further detail in Carbon Creek's memorandum of law in support of its motion to exclude Porter's opinion, Porter's damage made no effort to exclude payments that — as a result of the $100 threshold and JIB netting under applicable JOAs — were not late under the Royalty Act. *Cf. In re Med. Waste Servs.*

---

[6] Because of the need to consider individualized issues, Colton also cannot show that adjudication of a certified class claim will be manageable under Rule 23(b)(3)(D). *See id.* at 562–63 (holding that the superiority requirement for class certification was not satisfied where case would be unmanageable given the "many individual issues . . . presented in this case").

20

*Antitrust Litig.*, 2006 WL 538927, at *6-7 (denying certification where plaintiff's expert "merely assumed" classwide liability when, in reality, liability could not be shown without an "exhaustive" inquiry). Because Porter's analysis "falls far short" of measuring class–wide damages, Colton cannot satisfy Rule 23(b)(3)'s predominance requirement.

**D.    The Oklahoma Court's Ruling in *Cline v. Sunoco* Demonstrates That Class Certification Is Inappropriate in this Case**

In his supporting brief, Colton relies almost exclusively on *Cline v. Sunoco, Inc. (R&M)*, 333 F.R.D. 676 (E.D. Okla. 2019), a case in which the court has not yet entered final judgment and has therefore not been tested on appeal.[7] Contrary to Colton's implication, the *Cline* court did not certify a class that is similar to the one that Colton seeks to certify. In fact, the court's ruling in *Cline* supports Carbon Creek's position that class certification is ***inappropriate*** in this case.

In *Cline*, the plaintiff alleged that Sunoco knowingly withheld payments that were unquestionably due under Oklahoma's royalty statute in an attempt to coerce royalty and overriding royalty owners to sign division orders setting forth each owner's interest in the well. *Id.* at 681. Sunoco improperly suspended payments to owners who did not promptly sign the division order. *Id.* When Sunoco released the money being held in suspense upon receipt of the signed division order, it did not include statutory interest on the past–due payments that had been held in suspense unless the owner requested the interest. *Id.* Importantly, the plaintiff agreed to modify the class to ***exclude*** payments that fell below the Oklahoma statute's $100 threshold as

---

[7] The *Cline* proceedings have followed a winding road to the Tenth Circuit and back, with the central question being whether the district court entered a final judgment from which Sunoco could appeal. Most recently, in August 2023, the Tenth Circuit remanded the case once again so that district court could "produce a final judgment that complies with our precedents." *Cline v. Sunoco, Inc. (R&M)*, No. 22–7018, 2023 WL 4946312, at *7 (10th Cir. Aug. 3, 2023). Following the district court's entry of a final judgment, Sunoco will presumably appeal the case to the Tenth Circuit so that it may, for the first time, consider the merits of the district court's certification decision.

well as payments that involved prior period adjustments. *See id.* at 682 ("Untimely Payments ***do***

***not include*** (a) payments of proceeds to an owner under [the $100 minimum provision]); (b) prior

period adjustments; or (c) pass–through payments.") (emphasis added).    The court noted that

revised class that the plaintiff proposed in its reply brief provided "a more narrow and manageable"

definition of a late payment. *Id.* at 682 n.4.

        A review of the underlying briefs in the *Cline* case reveals why the plaintiff revised his

class definition.    In its opposition to class certification, Sunoco argued that "[t]he Court would

need to individually determine whether any payment made more than two months after the

production is sold (or six months after first sale) falls within the minimum pay provisions" or "is

actually the result of having to correct an incorrect payment[.]" *See* Sunoco's brief in opposition

to class certification, a copy of which is attached hereto as Exhibit E, at 32–33.    The plaintiff

responded in his reply brief that Sunoco already had the necessary data to exclude these payments

"but, it only uses it ***after*** an owner makes a written demand for interest." *See* Cline reply brief in

support of class certification, a copy of which is attached hereto as Exhibit F, at 8.    The plaintiff

further represented that his expert could modify her calculations to exclude those payments in light

of the fact that Sunoco already possessed the necessary data in summary format. *See id.* at 8–9

(arguing "[i]t's just math.").    Because the plaintiff's revised definition of the class excluded

payments that would require individualized analysis, and his expert represented "that she can

exclude those payments from her model," the court certified the class. *Cline*, 333 F.R.D. at 686.

        It is also important to note that *Cline* did not involve payments to working interest owners.

The Oklahoma statute at issue expressly limited the definition of "owner" to persons with an

interest in the "mineral acreage" under the well. *Id.* at 681 n.1.    Because working interest owners

do not possess interests in the "mineral acreage," the court recognized that the statute did not

govern payments to working interest owners. *Id.* In contrast, the Royalty Act is broader and governs payments to all persons legal entitled to the "proceeds derived from the sale of production from any well producing oil, gas, oil related hydrocarbons in the state of Wyoming" — which includes working interest owners. Wyo. Stat. Ann. § 30–5–301(a).[8]

In this instance, the class that Colton seeks to certify is materially different than the class that the *Cline* court ultimately certified. Colton has not excluded payments that did not exceed the $100 threshold. Colton has not excluded payments that involved PPAs. Colton has not excluded payments to working interest owners. And importantly, unlike the summary documents that Sunoco apparently maintained, Carbon Creek does not possess summary documents or spreadsheets that would allow Colton (or the Court) to easily identify and exclude those payments from the class in this case.

In summary, the circumstances surrounding the *Cline* court's decision to certify a "more narrow and manageable" class demonstrates that Colton's putative class **cannot** be certified. The plaintiff agreed to exclude all payments that would require an individualized analysis in order to ascertain whether those payments were in fact "late." For this reason, the *Cline* court certified a class that included undisputedly late payments based upon Sunoco's own summary documents.[9]

---

[8] In fact, the Royalty Act contains an express definition of "working interest." Wyo. Stat Ann. § 30–5–304(a)(viii).

[9] Unlike Sunoco, Carbon Creek did not make late payments that it knew should be accompanied by penalty interest. *See* Discovery Responses, Admission Request No. 15 (stating "[w]ith respect to payments subject to the Royalty Act, Carbon Creek is not currently aware that it made any particular payment that did not comply with the Royalty Act."). Instead, Colton merely notes that Carbon Creek did not issue any checks in particular months. Colton Brief at ¶ 20. But this fact does not demonstrate that Carbon Creek knew that any particular owner was entitled to penalty interest. Instead, this fact suggests that Carbon Creek identified a systemic error or update that caused overpayments to all owners (and thereby required a PPA for all owners). Colton's failure to demonstrate Carbon Creek's knowledge regarding **any** late payment, let alone **every** asserted late payment in the class, stands in sharp contrast to *Cline*.

Because Colton did not (and cannot ) limit his putative class — given the fact that Carbon Creek does not possess summary documents which identify admittedly late payments — this Court cannot certify a class that resembles the class at issue in Cline.[10]

### E.    The Motion Fails as a Matter of Law Because Porter's Proffered Expert Opinion Is Unreliable and Inadmissible

As a final matter, it is important to note that Carbon Creek has filed a motion to exclude Porter's purported expert opinion as inadmissible under Rule 712 of the Federal Rules of Evidence. Carbon Creek incorporates the arguments set forth in its brief in support of that motion by reference. As set forth in that brief, Porter's report fails to satisfy the standard for admissibility of expert evidence set forth in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny.

Because Porter's opinion constitutes Colton's only evidence in an attempt to demonstrate that the putative class members' damages are measurable on a class–wide basis, the exclusion of Porter's opinion is fatal to the motion for class certification.  "Expert testimony that is insufficiently reliable to satisfy the *Daubert* standard cannot 'prove' that the Rule 23(a) prerequisites have been met 'in fact,' nor can it establish 'through evidentiary proof' that Rule 23(b) is satisfied." *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015); *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, No. 17–MD–2785, 2020 WL 1164869, at *2 (D. Kan. Mar. 10, 2020) (citing *Blood Reagents* with approval).  For this reason, in cases in which the only evidence that the plaintiff proffers for measuring damages is an inadmissible  expert opinion, the court has denied class certification.  *See, e.g., Prantil v. Arkema France S.A.*, No. 17–cv–

---

[10] Colton also cites to class settlements regarding alleged "late" payment of royalties.  Colton Brief at 16 n.2.  But these settlements are irrelevant because the standard for certification of a settlement class is materially different.  *See* 2 Newberg on Class Actions § 4:63 (5th ed.) ("Courts therefore regularly certify settlement classes that might not have been certifiable for trial purposes . . . .").

02960, 2022 WL 1570022, at *31 (S.D. Tex. May 18, 2022) (denying class certification because without excluded expert testimony, "Plaintiffs have no mechanism for calculating damages on a class–wide basis").[11]

Here, Porter's expert opinion is the only evidence that Colton has proffered in an attempt to prove that damages are measurable on a class–wide basis. Because Porter's opinion is inherently unreliable and inadmissible, Colton has necessarily failed to meet his evidentiary burden of demonstrating the requirements of Rule 23 have been satisfied.

## CONCLUSION

For the foregoing reasons, Carbon Creek respectfully requests that the Court summarily deny Colton's motion for class certification.

Dated: October 6, 2023                   Respectfully submitted,


                                          **McGUIREWOODS LLP**

                                          By: /s/ Gregory J. Krock
                                          Gregory J. Krock (*Pro Hac Vice*)
                                          Alexander M. Madrid (*Pro Hac Vice*)
                                          Allison L. Ebeck (*Pro Hac Vice*)

                                          Tower Two–Sixty
                                          260 Forbes Avenue, Suite 1800
                                          Pittsburgh, PA 15222–3142
                                          Telephone: (412) 667–6000
                                          Facsimile:  (412) 667–6050

---

[11] *See also In re Pharmacy Benefit Mgrs. Antitrust Litig.*, No. 03–4730, 2017 WL 275398, at *31, 35 (E.D. Pa. Jan. 18, 2017) (denying certification after holding "Plaintiffs' proposed damages model fails the *Comcast* test, and thus cannot serve as common evidence of predominance"); *Weiner v. Snapple Bev. Co.*, No. 07–8742, 2010 WL 311952, at *10 (S.D.N.Y. Aug. 5, 2010) (excluding expert's opinion and holding that without it "plaintiffs offer no evidence that a suitable methodology is available to prove the elements of causation and actual injury on a classwide basis"); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 577–78 (C.D. Cal. 2014) (striking expert's testimony and holding "plaintiffs have not shown that damages can be calculated on a classwide basis.

M. Gregory Weisz (Wyo. State Bar #6–2934)
Dustin J. Richards (Wyo. State Bar #7–4971)
Crystal D. Stewart (Wyo. State Bar #7-6057)
**PENCE AND MACMILLAN LLC**
P.O. Box 765
Cheyenne, Wyoming 82003
Telephone: (307) 638-0386
Facsimile: (307) 634-0336

*Counsel for Defendant Carbon Creek Energy, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies the foregoing **Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification** was electronically filed via the CM/ECF system on the 6th day of October 2023, which system will effectuate service upon the following counsel of record:

Kelly Shaw
Travis W. Koch
KOCH Law, P.C.
121 W. Carlson Street, Suite 3
Cheyenne, WY 82009
*Co–Counsel for Plaintiff*

George A. Barton
Stacy A. Burrows
Seth K. Jones
BARTON & BURROWS, LLC
5201 Johnston Drive, Suite 110
Mission, KS 66205
*Co–Counsel for Plaintiff*

/s/ Gregory J. Krock
Gregory J. Krock