# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **PERRY CLINE, on behalf of himself and all others similarly situated,** ) ) ) ) | |
| **Plaintiff,** ) ) | |
| v. ) ) | Case No. 17-cv-313-JAG |
| **SUNOCO, INC. (R&M) and SUNOCO PARTNERS MARKETING & TERMINALS, L.P.,** ) ) ) ) ) | |
| **Defendants.** ) | |

### PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
### MOTION TO CERTIFY CLASS, TO APPOINT CLASS REPRESENTATIVE, AND TO APPOINT CLASS COUNSEL AND BRIEF IN SUPPORT

A. **NINE** PRSA STATUTORY INTEREST CLASS ACTION SETTLEMENTS ARE PENDING OR HAVE BEEN APPROVED.

Sunoco spends the majority of its 35-page *Response* spinning a fantasy tale of complexity and reasons for its habitual violation of Oklahoma law. With regard to its obligations under the PRSA, Sunoco complains the Act is too complicated; knowing when it should pay people is too hard; and calculating the amount of money it owes people is too difficult. Indeed, Sunoco confesses its habitual violation of the PRSA by arguing it is "impossible" for Sunoco to comply with its statutory obligations. *Response* at ECF p. 17. With regard to class certification, Sunoco argues extensive "mini trials" would be required to identify people who received late payments of production proceeds without statutory interest and that extensive, "individualized inquiries" would be required to determine whether statutory interest is owed to such class members and in what amounts. The Court should reject each of these baseless arguments.

Sunoco's tale of woe is belied by the clear, unambiguous text of the PRSA and the fact that as of the filing of this *Reply*, at least ***nine*** other class action cases for PRSA statutory interest have been settled or are currently in the process of being settled in Oklahoma.[1] The defendants in these cases made the same arguments Sunoco advances in this litigation and yet, each of the approved settlements has been able to: (a) ascertain class membership; (b) allocate funds to class members based on their untimely payments; and (c) distribute unpaid statutory interest payments to class members. Importantly, some of the settlements have also provided "Future Benefits" consisting

---

[1]  *See* (1) *McClintock v. Continuum Producer Services, L.L.C.*, Case No. 17-CV-259-JAG (Doc. No. 38); (2) *Ashcraft Group, LLC v. Silver Creek Oil & Gas, LLC*, Case No. 16-CV-388-RAW (E.D. Okla.) (Doc. No. 89); (3) *McNeill v. Citation Oil & Gas Corp.*, Case No. 17-CV-121-KEW (E.D. Okla.) (Doc. No. 84); (4) *Reirdon v. XTO Energy, Inc.*, Case No. 16-CV-087-KEW (Doc. No. 122); (5) *Reirdon v. Cimarex Energy, Co.*, Case No. 16-CV-113-KEW (Doc. No. 102); (6) *Chieftain Royalty Co. et al., v. Marathon Oil Co.*, Case No. 17-CIV-334-SPS (E.D. Okla.) (Doc. No. 122); (7) *DASA Investments, Inc. v. EnerVest Operating, L.L.C., et al.*, Case No. 18-CV-083-RAW (Doc. No. 60); (8) *Stamps Bros. Oil & Gas, LLC v. Continental Resources, Inc.*, Case No. 14-CV-182-HE (W.D. Okla.) (Doc. No. 148); and (9) *CEOG, LLC. v. Chesapeake Operating, L.L.C.,* Case No. 16-CV-776-HE (W.D. Okla.) (Doc. No. 47).

of the defendant's agreement to comply with the PRSA in the future, including the requirement that statutory interest on late payments will be paid to owners ***without demand***.[2]

Plaintiff respectfully submits the existence of these settlements is persuasive evidence that it is possible, on a class-wide basis, to (1) identify owners who received late payments of production proceeds without statutory interest, and (2) calculate how much statutory interest is owed to each owner. This is *exactly* what these settlements did, *exactly* what Plaintiff seeks to do in this case, and *exactly* what Sunoco claims is impossible. The Court should reject Sunoco's baseless attempt to diminish the importance of these settlement classes by arguing the requirements of Rule 23 are different or more relaxed in the settlement context. *Response* at n.2, ECF p. 11. Indeed, the authority Sunoco cites does not even support its assertion. *See, e.g., Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620, n.16 (1997) (expressly rejecting the argument that settlement class certification is "granted more readily than it would be were the case to be litigated" because "other specifications of the Rule – those designed to protect absentees by blocking unwarranted or overbroad class definitions – demand undiluted, even heightened, attention in the settlement context."). Sunoco has not identified any error by any court approving these statutory interest settlements or any error in the allocation methodology for the funds.

The fact that these are settlements is irrelevant because the plans of allocation in these cases are identical to the methodology proposed by Plaintiff in this case. Sunoco continues to hold tens of millions of dollars it owes to owners and, as proven time and time again by the successful settlements identified above, it is feasible to pay that money to its rightful owners. Therefore, it is proper to consider these approved settlements as persuasive evidence that Plaintiff's PRSA statutory interest case satisfies Rule 23. *See Amchem Products, Inc.*, 521 U.S. at 620.

---

[2] *See, e.g., Chieftain v. Marathon*, Case No. 17-CIV-334-SPS (E.D. Okla.) at Doc. No. 70-1 (ECF p. 14); *Reirdon v. XTO Energy Inc.*, Case No. 16-CV-087-KEW (E.D. Okla.) at Doc. No. 76-1 (ECF p. 16); *and Reirdon v. Cimarex Energy Co.*, Case No. 16-CV-113-KEW at Doc. No. 52-1 (ECF p. 14).

2

**B.   SUNOCO'S DIVISION ORDER PRACTICE ENCAPSULATES THE PROBLEM THE LEGISLATURE SOUGHT TO REMEDY THROUGH THE PRSA.**

A division order is a document used to confirm an owner's proportionate share of production proceeds from an oil or gas well. However, over time, many operators or first purchasers added self-serving language to their standard division orders and began to use division orders as a way to extort additional concessions from owners by suspending an owner's royalty payments if he refused to sign a division order. As recently recognized by the Oklahoma Attorney General, the Oklahoma legislature enacted the PRSA to stop this kind of abusive behavior by the oil and gas industry.[3]  2015 WL 5193536 (Okl. A.G. Sept. 1, 2015) Opinion No. 2015-6 at *1-4, *citing Hull v. Sun Refining & Mktg. Co.*, 1989 OK 168, 789 P.2d 1272, 1277-79 (holding Sunoco predecessor, Sun Refining, could not withhold payment for failure to sign a division order).

In the words of Yogi Berra: It's déjà vu all over again. Sunoco is up to its old tricks. The Division Order Contract Sunoco sent to Mr. Cline is a prime example of the extortionary tactics outlawed in Oklahoma decades ago. Sunoco's Division Order Contract goes far beyond simply trying to confirm Mr. Cline's ownership interest and information for making payments to him. Instead, Sunoco's Division Order Contract attempts to require Mr. Cline to indemnify Sunoco, to pay Sunoco's attorneys' fees, ***and to waive his right to statutory interest***. *See* Exh. 1.[4]  Contrary

---

[3]   This abusive behavior is on display in this case. Sunoco touts that 90% of its payments are made to producers and working interest owners. *Response* at ECF p. 1. However, the damages in this case tell a different story. Seventy-three percent (73%) of the total damages in this case are owed royalty owners like Plaintiff who are often less sophisticated than producers and working interest owners and unaware of their right to interest. Ex. 16 to *Motion* (Ley Rebuttal Report, p. 6, fn. 2). As by explained by Sunoco's Senior Manager of Lease Administration, "[N]ormally the Oklahoma statute, while a concern, is not much of a driver in our decisions because the interest is not often requested when finding owners." *Motion*, p. 5.

[4]   Review of the language in Sunoco's Division Order Contract shows Sunoco's attempt to require Mr. Cline to waive his right to statutory interest misses its mark. The provision states that, in the event of a title dispute regarding the owner's division of interest, Sunoco is "authorized to withhold payments accruing to such interest, without interest *unless otherwise required by applicable statute*…." *See* Exh. 1 (emphasis added). Because the PRSA requires payment of statutory interest when title becomes unmarketable as a result of a dispute, this sentence is reasonably understood to recognize the supremacy of the statute and thus, to still require payment of statutory interest. This conclusion is important to Plaintiff's refutation of Sunoco's arguments on predominance and asserted individual questions in Section E.4, *infra*.

3

to Sunoco's erroneous representations, Mr. Cline did not "ignore" Sunoco's Division Order. *Response* at ECF pp. 13.[5] Mr. Cline simply exercised his legal rights under Oklahoma law.

Oklahoma does not require owners to sign division orders and first purchasers (like Sunoco) are not allowed to suspend payments to royalty owners for failure to sign a division order. In 1989, the Oklahoma Supreme Court held that enactment of the statute ended the common law practice of requiring owners to sign division orders as a precondition to payment. *See Hull v. Sun Ref. & Mktg. Co.,* 1989 OK 168, 789 P.2d 1272, 1279. The Court should reject Sunoco's desperate attempt to escape the consequences of its unlawful behavior by relying on the **dissent** in *Hull*. *Response* at ECF p. 14. The fact that the Oklahoma Supreme Court issued the *Hull* decision on a factual record that predated the July 1 effective date of a 1989 amendment to the statute does not limit its temporal scope. Although the Supreme Court recognized the 1989 amendment in a footnote, it left open the question of whether the amendment might "affect future causes presenting the issue of execution of division orders." *Id*. at n. 7. The Tenth Circuit Court of Appeals has answered the question left open in *Hull*.

In *Quinlan v. Koch Oil Co*., 25 F.3d 936, 940 (10th Cir. 1994), the Tenth Circuit Court of Appeals relied on *Hull* to hold that the first purchaser defendant was required to pay 12% interest on payments withheld for unsigned division orders both before ***and after*** the July 1, 1989 effective date of the amendment to 52 O.S. 540. Sunoco does not mention *Quinlan* in its *Response* but, the Tenth Circuit's decision is controlling authority which refutes Sunoco's argument that *Hull* is no longer good law.[6]

---

[5] On a similar note, Sunoco's assertion that Mr. Cline never "requested interest on any late payments of proceeds prior to his filing this lawsuit" (*see Response* at ECF p. 21) is irrelevant and directly contradicted by the testimony and exhibits from Mr. Cline's depositions. *See* excerpts from the deposition of Mr. Cline attached hereto as Exh. 2 and Exh. 3 (Mr. Cline's handwritten notes from the calls to Sunoco referenced in Exh. 2).

[6] Sunoco's reliance on Section 570.11 of the PRSA does not support its position. Nothing in Section 570.11 authorizes division orders to be used as a precondition for payment under the PRSA. If the legislature had intended this result (*i.e.,* that payments can be withheld for failure to sign a division order), the legislature would have amended Section 570.10(B)(1) to recognize the execution of a division order as a trigger for the timing requirements for payment to the execution

4

**C. THE COURT SHOULD REJECT SUNOCO'S ABSURD ARGUMENT THAT THE PRSA DOES NOT REQUIRE PAYMENT OF STATUTORY INTEREST AT THE SAME TIME LATE PAYMENTS ARE MADE.**

Sunoco has the audacity to argue it is not actually required to *pay* accrued interest when it makes late payments of proceeds because even though the PRSA says untimely payments "shall earn" interest and that first purchasers (like Sunoco) "shall be liable to such owners for interest," the statute "does not contain a specific provision regarding *when* interest should be paid." *Response* at ECF p. 17 (emphasis added). Let that sink in. Sunoco wants the Court to believe the Oklahoma legislature went through the trouble of enacting the PRSA to address decades of bad behavior by the oil and gas industry (*i.e.*, intentionally late paying proceeds to owners) but did not intend that the mandatory interest be paid when they make untimely payments. This is absurd. If this were the case, the PRSA would be meaningless and have no effect because the oil and gas industry would be right back where they were in the 1980's – free to use owners' money as interest free loans to themselves. Sunoco's argument is contrary to both the letter and spirit of the PRSA and must be rejected. *See Joseph E. Seagrams & Sons, Inc. v. Oklahoma Alcoholic Beverage Control Bd.*, 1981 OK 135, 637 P.2d 88, 92 ("the legislature will not be presumed to do a vain and useless act" and "[s]tatutes may not be construed to obtain an absurd result.").

In addition to being an unreasonable interpretation, it is contrary to Oklahoma law. While Sunoco does not like the *Pummill* case, it has no basis to argue that it does not mean exactly what it says. In *Pummill v. Hancock Exploration LLC, et al.*, the Oklahoma Supreme Court affirmed the trial court's summary judgment ruling that the PRSA requires the payment of statutory interest **without a prior demand** from a royalty owner. *See* the district court's Summary Judgment Order at Doc. No. 91-8, ECF p. 4; the Supreme Court's Corrected Order, at Doc. No. 91-9 at ECF p. 3 (affirming summary judgment that no demand is required in Oklahoma for statutory interest (Issue IV) while reversing and remanding for further proceedings on Issues I through III); *and* Order

---

of a division order. Section 570(B)(1) says proceeds "shall" be paid "not later than six (6) months after the date of first sale" and "thereafter not later than the last day of the second succeeding month after the end of the month in which production is sold." The legislature did not say that the clock only begins to run if a division order has been signed. The plain language of the PRSA must control and the plain language of the PRSA refutes Sunoco's argument.

5

Affirming Trial Court at Doc. No. 91-10 at ECF p. 9 (confirming the Oklahoma Supreme Court "affirmed the trial court's judgment as to statutory interest"). This is binding precedent.

**D.   SUNOCO ALREADY HAS A COMPUTER SYSTEM TO CALCULATE STATUTORY INTEREST – IT JUST USES IT SELECTIVELY.**

Each year, Sunoco submits a report to the Oklahoma Corporation Commission ("OCC") accompanied by the payment of royalties and statutory interest owed to owners Sunoco has not located.[7] Review of this report shows Sunoco's arguments regarding the difficulty of identifying late payments and computing statutory interest to be patently false. Each OCC report identifies the mineral revenue ***and statutory interest*** owed to hundreds and hundreds of owners. Sunoco does not tell the State of Oklahoma it is too difficult to calculate statutory interest for each owner, Sunoco just does it – each and every year – for hundreds of owners in a single report. Moreover, the determination that interest is owed and the calculation of interest for such owners is done without the investigation of individual issues. In other words, Sunoco is able to determine owners that are owed interest for purposes of this report without looking at division order files, reviewing title opinions, or reviewing contract provisions in leases, division orders or purchase agreements.[8] Indeed, the submission of Sunoco's report to the OCC is proof that a class action on statutory interest is manageable; that class members are ascertainable from Sunoco's own records; and that class damages can be calculated on both an individual and class-wide basis. In the end, statutory

---

[7]   *See, e.g*, Sunoco's 2017 Report attached hereto as Exh. 4. This Report shows Sunoco paid $127,394.66 in statutory interest to the OCC for the 2017 reporting year. *See id*. at OCC-Sunoco-000455 - 456. Sunoco's Report follows the form and instructions found on the OCC's website at https://www.occeweb.com/ad/MOEA.html (a copy of the OCC's form and instructions is attached hereto as Exh. 5 (requiring payment of interest under Section 570.10).

[8]   The OCC sends Sunoco a list of unlocatable owners each year. Sunoco is responsible for paying the proceeds of the unlocated owners to the OCC with statutory interest. Sunoco's process for doing this is rather simple. It looks each owner up in the system to make sure they have not been located and paid. Sunoco then removes the suspense code in the system and applies a certain pay code to each unlocated individual identified by the OCC. Sunoco's system populates all owners with this pay code into a report. The system then calculates the proceeds and interest for each of these owners in one report which is submitted to the OCC along with a check totaling the proceeds and interest owed these unlocated owners. *See* deposition excerpts at Exh. 6 and Exh. 7.

6

interest is just a mathematical computation based on the date of production, the date of payment, and the applicable statutory interest rate of 6% or 12%. No more is required.

Moreover, Sunoco has a computer system specifically designed to compute statutory interest but, it only uses it *after* an owner makes a written demand for interest. *See* Exh. 8. Exhibit 8 is a collection of computer "screen shots" which show how Sunoco calculates statutory interest through a specific data entry page titled "PROCESS OWNERS DUE INTEREST ON SUSPENSE MONIES." Review of the data entry page shows a standardized template for entering the following values: the Owner Number; the time period for which statutory interest is to be calculated; the check date; the interest percent (*e.g.*, 6 or 12); the interest type (*e.g.*, simple or compound); and whether the interest is to be compounded daily, weekly, monthly, quarterly, semi-annually, or annually. When Sunoco receives a request for statutory interest, it does not "reinvent the wheel" each and every time as part of some novel or extensive investigation. Sunoco uses the computer system it designed for this very purpose (*i.e.*, calculating statutory interest). Sunoco could use this system – or one like it – to calculate statutory interest to be paid to owners without demand, in accordance with the PRSA. Sunoco simply chooses not to do it.[9]

Sunoco's calculation of statutory interest is also consistent with the statutory interest calculations offered by Plaintiff's expert, Barbara Ley. *See* Exh. 8. Ms. Ley used a method and system very similar to Sunoco's own standardized, automated process referred to as an "INTEREST DUE OWNER REPORT." Importantly, for purposes of class certification, the report created by Sunoco and Ms. Ley's work are both generated based on objective information within Sunoco's control – *i.e.*, Owner number; annual interest rate; whether the interest is compounded or simple; the production date; and check information. The "INTEREST DUE" is calculated by multiplying the "net amount" of the late payment by a "daily rate of interest" and the number of

---

[9] Of the approximately 300 owners to whom Sunoco claims to have paid interest after a written demand, no deposed Sunoco employee could think of a single instance when Sunoco was unable to compute and pay the statutory interest demanded. It is only when faced with a class action that Sunoco contends this task becomes too difficult.

7

days for which interest must be calculated. *See id*. It's just math. Importantly, it is math that is consistent with the methodology set forth in Ms. Ley's Expert Reports. *See Response* to *Defendants' Motion to Exclude the Reports and Opinions of Plaintiff's Proposed Expert, Barbara A. Ley* (Doc. No. 113) for a more complete description of Ms. Ley's methodology.

E. **CLASS CERTIFICATION IS PROPER BECAUSE COMMON QUESTIONS OF LAW AND FACT PREDOMINATE.**

Sunoco identifies six "individualized inquiries" in support of its argument that individual, rather than common inquiries, will predominate as to PRSA liability. *Response* at ECF p. 31. None of these assertions has any merit.

1. **Six Month Grace Period**. The PRSA requires proceeds to be paid within six months after the date of first production from a well. This allows operators and first purchasers a full six months to identify the owners entitled to payment. If Sunoco's position is that it does not have this information readily available and that finding it would "require manual research and a possible inquiry to the Oklahoma Corporation Commission" (*Response* at ECF p. 31) then Sunoco is admitting it has no idea if it is paying people on time because it has never bothered to fulfill its statutory obligation in the first place. Regardless, the date of first production is objective information and it is ascertainable from Sunoco's business records or the Oklahoma Corporation Commission. Exh. 16 to *Motion* at ¶¶ 37-39. Determining late payments is then just a matter of comparing the dates of payments to the dates of first production. *See id.*

2. **Unmarketable Title – 6% Interest**. Sunoco has an elaborate coding system which is used to track why various proceeds are held in suspense. Plaintiff need not affirmatively show that title was marketable for each payment. *See Quinlan v. Koch Oil Company*, 25 F.3d 936, 940 (10th Cir. 1994). This is Sunoco's burden, not Plaintiff's. Thus, once Plaintiff shows a late payment, the default rate under the PRSA is 12%, and Sunoco must then argue that a different rate should apply. To the extent it chooses to do so, Sunoco can rely on the codes it uses every day for its routine business operations – codes Sunoco's own Manager of Lease Administration testified have been applied correctly by Sunoco's employees and which the Court and a jury can rely on to

8

understand the reason why an owner's funds were held in suspense. *See* Exh. 3 to Plaintiff's *Motion*, Koelling Depo. at 30:25 – 31:9. Moreover, this is solely a question of the amount of damages. It has nothing to do with identifying class members or determining whether they were paid late without interest. Damages questions alone do not defeat class certification. *See Tyson Foods Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016); *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 408 (2d Cir. 2015); *see also In re Urethane Antitrust Litig.*, 251 F.R.D. at 632, 639.

**3.** **Minimum Suspense**: As a practical matter, some owners have such a small interest in a well that it makes no sense to require first purchasers (like Sunoco) to send monthly checks for very small amounts. The PRSA addresses this issue by allowing certain minimum amounts of proceeds to accumulate over several months before payment is necessary. *See* OKLA. STAT. tit. 52, § 570.10(B)(3). However, minimum suspense payments made beyond the 6-month or 60-day time periods under the PRSA are not late and they do not fall within the definition of "Untimely Payments" included in Plaintiff's *Petition*. Doc. No. 2-2. Therefore, this is a non-issue because these "minimum pay" amounts are not part of Plaintiff's claims. Sunoco already knows this as a result of extensive discovery and its deposition of Plaintiff's expert, Ms. Ley.

**4.** **Waiver of Interest**. The PRSA requires payment of 6% interest when proceeds are suspended for unmarketable title and the statute requires 12% interest when proceeds are suspended for any other reason. OKLA. STAT. tit. 52, §570(D). There can be no individualized inquiries with regard to 12% interest because the Tenth Circuit has declared it is not possible to waive one's right to this interest. *In re Tulsa Energy, Inc. v. KPL Production Co.*, 111 F.3d 88, 90 (10th Cir. 1997). And, as explained earlier in n. 3, Sunoco's Division Order Contract tries – but fails – to effectively require waiver of an owner's right to receive 6% interest.

Moreover, Sunoco's "individualized waiver" argument is similar to the "individualized consent" argument recently rejected by Judge Friot in the Western District of Oklahoma. *See Braver v. Northstar Alarm Servs., LLC*, 329 F.R.D. 320 (W.D. Okla. 2018). In *Braver*, the district court rejected the defendant's affirmative defense of "individualized consent" and certified a class of persons who received phone calls bearing specific "status codes" in business records. *Id.* at

9

332-333. Importantly, the district court rejected the defendant's hypothetical defense of "possible" consent because the defendants "presented no evidence of any written consent, making such a defense speculative (to be charitable about it)." *Id*. at 333. Sunoco has not produced a single example of anyone waiving his or her right to statutory interest and, as explained above, Sunoco's Division Order Contract does not achieve this end. Therefore, the Court should reject Sunoco's attempt to defeat class certification with imaginary defenses. *See, e.g.*, *G.M. Sign, Inc. v. Group C Commc'ns, Inc.*, No.08-cv-4521, 2010 U.S. Dist. LEXIS 17843, at *15-16 (N.D. Ill. Feb. 25, 2010) ("vague assertions" about potential, hypothetical individual issues do not overcome evidence).

       **5.**    **Pass-Through Payments**. Sunoco's arguments about pass-through payments have no bearing on this case. Plaintiff's claims are based late payments from oil production – not gas. Therefore, all of Sunoco's complaints that gas purchasers often provide Sunoco proceeds late is completely irrelevant to Plaintiff's claims. *Response* at ECF p. 33. To reflect this fact, Plaintiff has instructed his expert, Barbara Ley, to remove all types of pass-through payments from her calculations. *See* Ley Rebuttal Report, Exh. 16 to *Motion* (Doc. No. 91), at p. 3, n.1.

       **6.**    **Prior Period Adjustments**. Sometimes payors of production proceeds make adjustments to the amounts owed to owners to correct prior calculations of production volumes, taxes, etc. Plaintiff has clarified that his definition of "Untimely Payments" does not include such adjustments. To further reflect this fact, Plaintiff's expert, Barbara Ley, removed these types of pass-through gas payments from her calculations. *See id*.

**F.**    **THE PROPOSED CLASS IS READILY ASCERTAINABLE FROM OBJECTIVE INFORMATION IN SUNOCO'S BUSINESS RECORDS.**

The Court should reject Sunoco's challenge to Plaintiff's class definition and the ascertainability of the proposed class. *Response* at ECF pp. 14-16. As an initial matter, Sunoco has not provided any authority for rejecting Plaintiff's proposed class definition, or for prohibiting an amended class definition if the Court determines one is warranted. Courts often allow amended class definitions at the certification stage because it is the Court, not the parties, that ultimately

sets the definition. *See, e.g.*, *Rhea v. Apache Corp.*, No. CIV-14-0433-JH, 2019 U.S. Dist. LEXIS 65381, at *30 (certifying royalty class but ordering modified class definition).

The sole case cited by Sunoco – *Polo v. Goodings Supermarkets, Inc.*, 232 F.R.D. 399 (M.D. Fla. 2004) – does not support Sunoco's argument in this regard. In *Polo*, the plaintiff sought a nationwide class certification for money damages and injunctive relief against operators of ATM machines for failure to disclose the actual amounts of ATM fees. *See id*. at 402-03. The district court analyzed the plaintiff's amended class definition and determined it, too, failed to satisfy virtually all the requirements of Rule 23 and that the only evidence of a violation related to the plaintiff. *Id*. at 409. Therefore, based on the district court's assessment of the record evidence, it appears the court declined to exercise its discretion to craft a new class because such an effort would be futile. *Id*.

In sharp contrast to *Polo*, Plaintiff's proposed class definition is precise, definite, and objective. This is not a case where class membership turns on someone's ability to prove he purchased a bottle of weight-loss pills by providing a receipt or submitting an affidavit that would then have to be tested through deposition. This is a case where proof of class membership is found within Sunoco's own business records as part of activities Sunoco *must* already perform under Oklahoma law. Determining class membership does not require *any* information from the proposed class. The Tenth Circuit has not spoken on the issue of whether "ascertainability" is a separate requirement for class certification. Regardless, Plaintiff's proposed class is readily ascertainable because it is based on objective information that is within Sunoco's business records. *See, e.g.*, *Braver,* 329 F.R.D. at 334 ("The ascertainability requirement is generally satisfied where…business records can be used to identify the class."), *accord AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 321 F.R.D. 677, 684 (M.D. Fla. 2017) ("Defendants' records, data, and electronic systems…satisfy the objective criteria necessary to ascertain the class members….").

As demonstrated above, Plaintiff's class definition satisfies the requirements of Rule 23 and similar class definitions have been used in other PRSA statutory interest cases that have

successfully paid tens of millions of dollars to tens of thousands of class members. *See* cases listed in n.1, *supra*. However, to avoid any possible confusion, Plaintiff suggests clarifying the term "Untimely Payments" within the class definition as follows:

> All non-excluded persons or entities who: (1) received Untimely Payments from Defendants (or Defendants' designees) for oil proceeds from Oklahoma wells and (2) who have not already been paid statutory interest on the Untimely Payments. An "Untimely Payment" for purposes of this class definition means payment of proceeds from the sale of oil production from an oil and gas well after the statutory periods identified in OKLA. STAT. tit 52, §570.10(B)(1) (*i.e.*, commencing not later than six (6) months after the date of first sale, and thereafter not later than the last day of the second succeeding month after the end of the month within which such production is sold). Untimely Payments do not include: (a) payments of proceeds to an owner under OKLA. STAT. tit 52, §570.10(B)(3) (minimum pay); (b) prior period adjustments; or (c) pass-through payments.

If the Court determines that modification of Plaintiff's class definition is appropriate, the Court should allow Plaintiff to submit an amended class definition or work with Sunoco and the Court to develop a class definition that reflects the practical realities of this case. *See, e.g., Davoll v. Webb*, 194 F.3d 1116, 1147 (10th Cir. 1999) ("If the court finds that the proposed definition is not sufficiently definite, it may modify the definition instead of dismissing the proposed action."); *accord Carpenter v. Boeing Co.*, 456 F.3d 1183, 1187 (10th Cir. 2006) ("The district court can modify or amend its class-certification determination at any time before final judgment in response to changing circumstances in the case.") (*citing* Fed. R. Civ. P. 23(c)(1)(C)). Moreover, it is error for a district court to take an "overly formalistic" approach to class definitions. *See In re Monumental Life Ins. Co. v. National Standard Life Ins. Co. et al.*, 365 F.3d 408, 414 (5th Cir. 2004) (reversing denial of class certification because "holding plaintiffs to the plain language of their definition would ignore the ongoing refinement and give-and-take inherent in class action litigation, particularly in the formation of a workable class definition.").

**G. SUNOCO'S THREAT OF THIRD-PARTY ACTIONS IS NOT RELEVANT TO PLAINTIFF'S CLAIMS OR TO CLASS CERTIFICATION.**

There is no merit to Sunoco's argument that the PRSA or Sunoco's contractual indemnity rights against producers should affect class certification or the trial in this matter. *Response* at

12

ECF p. 35. Section 570.10(E)(1) of the PRSA states that "a first purchaser or holder of proceeds who fails to remit proceeds from the sale of oil or gas production to owners legally entitled thereto within the time limitations set forth in…this section **shall be liable to such owners** for interest as provided in subsection D of this section on that portion of the proceeds not timely paid." (emphasis added).[10] The PRSA does not contemplate owner claims against anyone other than the entity who fails to remit payments within the Act's timeframes. Indeed, Section 570.10(C)(4) is the only PRSA provision contemplating the circumstances described by Sunoco and that section contemplates a reassignment of responsibility *after* liability has been "incurred by the party making the incorrect payment."[11] Sunoco made the incorrect payments and it is liable to Plaintiff and the class. If Sunoco wants to pursue its contractual indemnity rights against third parties, it is free to do so. However, neither Plaintiff nor members of the putative class are parties to those contracts and they are not part of this case.

**H.   PLAINTIFF'S FRAUD CLAIM SHOULD BE ALLOWED TO PROCEED ON A CLASS-WIDE BASIS.**

Sunoco's desperate attempt to avoid a fraud claim has caused it to argue itself into a corner. On the one hand, Sunoco argues no one can know whether any owner was paid late or is owed statutory interest without conducting extensive, individualized inquiries (*Response* at ECF p. 9) and yet, on the other hand, Sunoco argues a fraud claim is unsupportable because an owner can "readily perceive from Sunoco's check stubs" whether the payment is late and whether interest might be owed. *Response* at ECF p. 37. Sunoco's checks are uniform, and they uniformly

---

[10]   Because Sunoco is paying owners as the "first purchaser," no other entity has a responsibility to "remit" payments to owners and no other entity has been "holder of proceeds." Therefore, the Act's provision for proportionate liability when "two or more persons fail to remit" does not apply. OKLA. STAT. tit. 52, § 570.10(E)(1). Likewise, the proportionate liability provisions in Section 570.10(E)(2) do not apply because that section applies to payments for natural gas and this case only involves oil. *See id*. and OKLA. STAT. tit. 52, § 570.4.

[11]   *See* OKLA. STAT. tit. 52, § 570.10(C)(4) ("Where royalty proceeds are paid incorrectly as a result of an error or omission, the party whose error or omission caused the incorrect royalty payments shall be liable for the additional royalty proceeds on such production and all resulting costs or damages *incurred by the party making the incorrect payment*.") (emphasis added)

concealed the fact that interest was owed. Class treatment of this claim is proper because whether such concealment constitutes fraud is a common question that will beget a common answer for the class. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) *and Loyal Protective Ins. Co. v. Shoemaker*, 1936 OK 491, 63 P.2d 960, 961 (a defendant who wrongfully conceals a material fact is not allowed to take advantage of his own wrong by pleading the statute of limitation).

## I.     PLAINTIFF HAS MET HIS BURDEN UNDER RULE 23.

Plaintiff has presented evidence satisfying the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a) and Plaintiff has satisfied Rule 23(b)(3) by showing the predominance of common questions which will generate common answers using evidence common to the class. The gravamen of Sunoco's *Response* in opposition to class certification is that it would be too difficult to know who it paid late and how much statutory interest is owed to them. However, knowing who it paid late and how much statutory interest is owed to them is exactly what Sunoco should be doing every day as part of its normal business operations because this is what Oklahoma law requires. Sunoco should not be allowed to escape the consequences of its actions by complaining it might have to do what it should have been doing all along. Moreover, the relief sought by the class is no different than if each class member had written to Sunoco on the same day to "demand" payment of statutory interest. The record evidence shows that upon receipt of such written demands, Sunoco would have calculated statutory interest and paid it – 100% of the time. The result should not be different just because the class "demand" has been communicated in the form of a *Complaint*.

## J.     HEARING ON CLASS CERTIFICATION

In response to the Court's *Pretrial Order* (Doc. No. 102), Plaintiff states he does not believe a hearing on class certification is required because the briefing record provides the Court with the necessary evidence and authorities for deciding whether to grant Plaintiff's *Motion*. However, should the Court determine a hearing would be helpful to its deliberations, Plaintiff asks that a full evidentiary hearing be held, as opposed to the limited oral argument requested by Sunoco.

Respectfully submitted,

s/Patrick M. Ryan
Patrick M. Ryan, OBA No. 7864
Phillip G. Whaley, OBA No. 13371
Jason A. Ryan, OBA No. 18824
Paula M. Jantzen, OBA No. 20464
RYAN WHALEY COLDIRON JANTZEN PETERS
 & WEBBER PLLC
900 Robinson Renaissance
119 North Robinson
Oklahoma City, OK  73102
Telephone:  405-239-6040
Facsimile:  405-239-6766
*pryan@ryanwhaley.com*
*pwhaley@ryanwhaley.com*
*jryan@ryanwhaley.com*
*pjantzen@ryanwhaley.com*

Bradley E. Beckworth, OBA No. 19982
Jeffrey Angelovich, OBA No. 19981
Andrew G. Pate, TX Bar No. 24079111
Trey Duck, OBA No. 33347
NIX PATTERSON, LLP
3600 North Capital of Texas Highway
Suite 350, Building B
Austin Texas, 78746
Telephone:  (512) 328-5333
Facsimile:  (512) 328-5335
*bbeckworth@nixlaw.com*
*jangelovich@nixlaw.com*
*dpate@nixlaw.com*
*tduck@nixlaw.com*

Susan Whatley, OBA No. 30960
NIX PATTERSON, LLP
205 Linda Drive
Daingerfield, TX 75638
(903) 645-7333 telephone
(903) 645-4415 facsimile
*swhatley@nixlaw.com*

15

                Michael Burrage, OBA No. 1350
                WHITTEN BURRAGE
                1215 Classen Dr.
                Oklahoma City, OK 73103
                (405) 516-7800
                (405) 516-7859
                *mburrage@whittenburragelaw.com*

                Robert N. Barnes, OBA No. 537
                Patranell Lewis, OBA No. 12279
                Emily Nash Kitch, OBA No. 22244
                BARNES & LEWIS, LLP
                208 N.W. 60th Street
                Oklahoma City, OK  73118
                Telephone:  (405) 843-0363
                Facsimile:  (405) 843-0790
                *rbarnes@barneslewis.com*
                *plewis@barneslewis.com*
                *ekitch@barneslewis.com*

                Lawrence R. Murphy, Jr., OBA No. 17681
                SMOLEN LAW, PLLC
                611 South Detroit Avenue
                Tulsa, OK 74120
                Telephone:  (918) 777-4529
                Facsimile:  (918) 890-4529
                larry@smolen.law

                **COUNSEL FOR PLAINTIFF**

### CERTIFICATE OF SERVICE

    I hereby certify that on August 28, 2019, I electronically transmitted the attached document to the clerk of this Court using the ECF system for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

    Mark D. Christiansen – mchristiansen@elbattorneys.com
    Daniel M. McClure – dan.mcclure@nortonrosefulbright.com
    Rebecca J. Cole – rebecca.cole@nortonrosefulbright.com

                *s/Patrick M. Ryan*
                Patrick M. Ryan