# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

PERRY CLINE, on behalf of himself, and all )
others similarly situated, )
)
      Plaintiff, )
)
v. )      Case No: 6:17-cv-313-JAG
)
SUNOCO, INC. (R&M); and )
SUNOCO PARTNERS )
MARKETING & TERMINALS, L.P., )
)
      Defendants. )

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION TO CERTIFY CLASS

Mark D. Christiansen OBA # 1675
**EDINGER LEONARD & BLAKLEY PLLC**
6301 N. Western Avenue, Suite 250
Oklahoma City, OK 73118
Telephone: (405) 702-9900
Fax:  (405) 605-8381
mchristiansen@elbattorneys.com

Daniel M. McClure OBA #20414
dan.mcclure@nortonrosefulbright.com
Kevin Yankowsky (*pro hac vice*)
kevin.yankowsky@nortonrosefulbright.com
Rebecca J. Cole (*pro hac vice*)
rebecca.cole@nortonrosefulbright.com
**NORTON ROSE FULBRIGHT US LLP**
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone (713) 651-5151
Fax (713) 651-5246

**ATTORNEYS FOR DEFENDANTS**

# TABLE CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    BACKGROUND ................................................................................................3

     A.     Sunoco's Payments of Oil and Gas Proceeds. .........................................3

         1.     Sunoco Purchases from Producers and Makes Payments to Producers and Royalty Owners of Some Producers. ...................................3

         2.     Sunoco Uses Division Orders to Ensure the Right Payee Is Paid Properly. ...................................4

         3.     The *Hull* Decision Does Not Render Sunoco's Use of Division Orders Illegal. ...................................5

     B.     The PRSA. ...................................6

     C.     Sunoco Almost Always Pays Timely, if Not *Early*. ...................................8

     D.     Sunoco's Interest Payment Practices Focus on Determining Whether Interest Is Due in Each Individual Circumstance. ...................................9

     E.     The Oklahoma Supreme Court Has Not Declared Sunoco's "Business Policy" to Be "Unlawful." ...................................10

     F.     Sunoco's Accounting Data Is Not Capable of Identifying All Class Members, and Sunoco Did Not Admit That. ...................................12

     G.     The Unique Circumstances of Late Payments to Perry Cline and Sunoco's Payment of Interest to Him. ...................................13

     H.     Plaintiff's Proposed Class Definition ...................................14

III.   STANDARD OF REVIEW ...................................16

IV.   ARGUMENT AND AUTHORITIES ...................................17

     A.     The Court Should Deny the Motion Because the Class Members Are Not Reasonably Ascertainable. ...................................17

         1.     The Proposed Class Cannot Be Ascertained Objectively and Would Be an Impermissible Fail-Safe Class. ...................................19

         2.     The Class Is Not Clearly Identifiable by Potential Class Members ...................................21

     B.     Common Questions Do Not Predominate Over Individual Questions of Law and Fact, as Required For Certification Under Rule 23(b)(3). ...................................22

         1.     Individual Rather Than Common Questions Predominate as to PRSA Liability. ...................................23

         2.     Damages Are Individualized and Not Capable of Classwide Determination Using Any Classwide Methodology. ...................................25

         3.     Sunoco's Pleaded Defenses Create Individual Questions of Law and Fact That Will Predominate. ...................................26

4.    The Fraud Claim Should Not Be Certified Because of Individual
      Questions Including Knowledge and Reliance. ..........................................28

5.    The Equitable Claims for Accounting and Disgorgement and
      Injunctive Relief Create Innumerable Individual Questions of
      Balancing the Equities as to Each Putative Class Member......................29

6.    Individual Questions Should Preclude Certifying a Class Prior to
      the Five-Year PRSA Statute Of Limitations..............................................30

C.    The Class Action Is Not "Superior" to Individual Resolutions of the
      Controversy, as Required by Rule 23(b)(3). ...........................................31

D.    The Prerequisites of Rule 23(a) for a Class Certification Have Not Been
      Satisfied....................................................................................................32

1.    The Claimed "Common" Questions of Law or Fact Will Not
      Generate Common Answers for All Members of the Putative
      Class. .........................................................................................................32

2.    The Claims and Defenses for the Named Plaintiff Perry Cline Are
      Not "Typical of the Claims or Defenses of the Class." ............................33

3.    The Named Plaintiff Perry Cline Is Not an "Adequate" Class
      Representative.............................................................................................34

V.    CONCLUSION..................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Am. Intern. Group, Inc. Sec. Litig.*,
   689 F.3d 229 (2d Cir. 2012) ................................................................................3

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ..................................................................................3, 22

*American Pipe & Constr. Co. v. Utah*,
   414 U.S. 538 (1947) ..................................................................................20

*Bogosian v. Gulf Oil Corp.*,
   561 F.2d 434 (3d Cir. 1977) .........................................................................35

*Bradley v. Allstate Ins. Co.*,
   620 F.3d 509 (5th Cir. 2010) ......................................................................13

*Byrd v. Aaron's, Inc.*,
   784 F.3d 154 (3d Cir. 2015) ..................................................................18, 21

*Carrera v. Bayer Corp.*,
   727 F.3d 300 (3d Cir. 2013) ..................................................................16, 18

*Castano v. Am. Tobacco Co.*,
   84 F.3d 734 (5th Cir. 1996) ........................................................................28

*CGC Holding Co. v. Broad & Cassel*,
   773 F.3d 1076 (10th Cir. 2014) ...................................................................23

*Cherokee Nation of Okla. v. United States*,
   199 F.R.D. 357 (E.D. Okla. 2001) ..............................................................34

*Chieftain Royalty Co. v. BP Am. Prod. Co.*,
   2017 WL 5012586 (E.D. Okla. Nov. 2, 2017) .............................................30

*Chieftain Royalty Co. v. XTO Energy, Inc.*,
   528 F. App'x 938 (10th Cir. 2013) ................................................................2

*Cole v. ASARCO, Inc.*,
   256 F.R.D. 690 (N.D. Okla. 2010) ...............................................................18

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) ..........................................................................17, 25

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ......................................................................................22

*In re Cox Enterprises, Inc. Set-Top Cable Television Box Antitrust Litig.*,
   2014 WL 104964 (W.D. Okla. Jan. 9, 2014) ...............................................18

*EQT Prod. Co. v. Adair*,
  764 F.3d 347 (4th Cir. 2014) ....................................................................................2, 19

*Folks v. State Farm Mut. Auto. Ins. Co.*,
  281 F.R.D. 608 (D. Colo. 2012) ....................................................................................26

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982) ....................................................................................................33

*Georgine v. Amchem Prods.*,
  83 F.3d 610 (3d Cir. 1996) *aff'd sub nom.*, *Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)......................................................................................................32

*Hall v. Burger King Corp.*,
  1992 WL 372354 (S.D. Fla. Oct. 26, 1992)......................................................................31

*Harper v. C.R. England, Inc.*,
  746 F. App'x 712 (10th Cir. 2018) ..................................................................................17

*Hayes v. Wal–Mart Stores, Inc.*,
  725 F.3d 349 (3d Cir. 2013)....................................................................................18, 22

*Henderson v. Trans Union LLC*,
  2016 WL 2344786 (E.D. Va. 2016)..................................................................................19

*Howell v. Texaco Inc.*,
  2004 OK 92, 112 P.3d 1154............................................................................................28

*Hull v. Sun Refining & Mktg. Co.*,
  1989 OK 168, 789 P.2d 1272......................................................................................5, 6

*Johnston v. HBO Film Mgmt.*,
  265 F.3d 178 (3d Cir. 2001)............................................................................................33

*Kamar v. RadioShack Corp.*,
  375 F. App'x 734 (9th Cir. 2010) ....................................................................................21

*Langbecker v. Elec. Data Sys. Corp.*,
  476 F.3d 299 (5th Cir. 2007) ..........................................................................................35

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3d Cir. 2012)....................................................................................17, 18, 19

*McElhaney v. Eli Lilly & Co.*,
  93 F.R.D. 875 (D.S.D. 1982) ..........................................................................................22

*McKnight v. Linn Operating, Inc.*,
  2016 WL 756541 (W.D. Okla. Feb. 25, 2016) ..............................................................2, 19

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) ..............................................................................19, 21, 22

*Naylor Farms v. Chaparral Energy, LLC*,
  923 F.3d 779 (10th Cir. 2019) ........................................................................................31

*Naylor Farms v. Chaparral Energy,*
    No. CIV-11-0634-HE (March 30, 2017) ...................................................................31

*NBL Flooring, Inc. v. Trumbull Ins. Co.,*
    2014 WL 615967 (E.D. Pa. Feb. 12, 2014) ...............................................................25

*In re Nexium Antitrust Litig.,*
    777 F.3d 9 (1st Cir. 2015).........................................................................................21

*O'Sullivan v. Countrywide Home Loans, Inc.,*
    319 F.3d 732 (5th Cir. 2003) ....................................................................................26

*Polo v. Goodings Supermarkets, Inc.,*
    232 F.R.D. 399 (M.D. Fla. 2004)..............................................................................16

*Pummill v. Hancock Exploration LLC,*
    2014 OK 97, 341 P.3d 69...................................................................................10, 11

*Randleman v. Fidelity Nat'l Title Ins. Co.,*
    646 F.3d 347 (6th Cir. 2011) ....................................................................................21

*Ray v. J.C. Penney Co.,*
    274 F.2d 519 (10th Cir. 1959) ..................................................................................13

*Rector v. City & County of Denver,*
    348 F.3d 935 (10th Cir. 2003) ..................................................................................34

*Reirdon v. Cimarex Energy Co.,*
    2019 WL 2610115 (E.D. Okla. June 25, 2019) .........................................................30

*Securities and Exchange Commission v. Gilder,*
    2014 WL 1628474 (D. Colo. 2014) ..........................................................................29

*Seeligson v. Devon Energy Prod. Co,*
    2019 WL 852060 (5th Cir. 2019) ...............................................................................2

*Seeligson v. Devon Energy Prod. Co., L.P.,*
    761 F. App'x 329 (5th Cir. 2019) ..............................................................................31

*Shook v. El Paso County,*
    386 F.3d 963 (10th Cir. 2004) ..................................................................................17

*Slapikas v. First Am. Title Ins. Co.,*
    250 F.R.D. 232 (W.D. Pa. 2008)...............................................................................28

*In re St. Jude Med., Inc.,*
    522 F.3d 836 (8th Cir. 2008) ....................................................................................28

*Sullivan v. DB Invs., Inc.,*
    667 F.3d 273 (3d Cir. 2011) (Scirica, J., concurring).................................................3

*TMBRS Prop. Holdings, LLC v. Conte,*
    2018 WL 2988663 (N.D. Okla. May 7, 2018)............................................................29

*In re Tulsa Energy, Inc.*,
   111 F.3d 88 (10th Cir. 1997) ..................................................................................26

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) .................................................................................28, 32, 33

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................................2

*Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*,
   725 F.3d 1213 (10th Cir. 2013) ..............................................................................2

*Warnick* v. *Dish Network LLC*,
   301 F.R.D. 551 (D. Colo. 2014) ...........................................................................18

**Rules and Statutes**

52 O.S. § 540 ....................................................................................................6, 27

52 O.S. § 570.10 .....................................................................................................7

52 O.S. § 570.10(B)(1) ..............................................................................7, 8, 9, 20

52 O.S. § 570.10 (B)(1)(a) .....................................................................................23

52 O.S. § 570.10(B)(3) ..............................................................................7, 20, 24

52 O.S. § 570.10(C)(4) ..............................................................................8, 20, 25

52 O.S. § 570.10(D) ................................................................................................7

52 O.S. § 570.10(D)(1) .........................................................................................12

52 O.S. §§ 570.10(D)(1), (E)(1) ..............................................................................9

52 O.S. § 570.10(D)(2) ...........................................................................................7

52 O.S. § 570.10(D)(2)(a) .....................................................................................23

52 O.S. § 570.10(E)(1) ............................................................................................8

52 O.S. § 570.10 (E)(2)(d) .................................................................................8, 25

52 O.S. § 570.11 ....................................................................................................6

52 O.S. § 570.14(D) ..............................................................................................30

52 O.S. Supp. 1989, § 540(B) amendment to § 540 ...............................................6

52 Okla. Stat. § 903 ..............................................................................................29

Fed. R. Civ. P. 23(a)(2) .........................................................................................32

Fed. R. Civ. P. 23(b)(3)(D) ....................................................................................32

Fed. R. Civ. P. 23 ...................................................................................................17, 34

Fed. R. Civ. P. 23(a) ..............................................................................16, 17, 18, 22, 32

Fed. R. Civ. P. 23(a)(3) ......................................................................................................33

Fed. R. Civ. P. 23(a)(4) ...............................................................................................34, 35

Fed. R. Civ. P. 23(b) .....................................................................................................16, 18

Fed. R. Civ. P. 23(b)(3) .......................................................................................... *passim*

Fed. R. Civ. P. 23(c)(2) ......................................................................................................18

Okla. Sup. Ct. R. 1.200(d)(2) ...........................................................................................11

## Other Authorities

7A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* §
     1768 (2nd ed. 1986) .................................................................................................35

Moore's Federal Practice, *Class Actions*, § 23.21[3][a] n.4 ........................................21

1 *Newberg on Class Actions* § 7:26, 139 (5th ed. 2013)...............................................21

2 *Newberg on Class Actions* § 4:63 (5th ed.)..................................................................3

Defendants, Sunoco Partners Marketing & Terminals, L.P. and Sunoco Inc. (R&M) (now Sunoco (R&M), LLC) (collectively "Sunoco"), file this response to Plaintiff's Motion to Certify Class, to Appoint Class Representative, and to Appoint Class Counsel and Brief in Support (Doc. 91) ("Motion" or "Motion to Certify"). Exhibits to this response are contained in a separately filed Appendix. Citations to exhibits in the Appendix will take the form "Ex. ___."

## I.    INTRODUCTION

Sunoco has purchased oil from wells in Oklahoma and made timely payment of more than 98% of all payments to royalty owners and working interest owners within two months of production. This case involves less than 2% of all payments, which Plaintiff alleges were "untimely" paid under the Oklahoma Production Revenue Standards Act ("PRSA"). There are many reasons why that 2% were not paid within two months of production, often because the funds were placed in "suspense" for a variety of reasons. But because of the complexity of the PRSA and its numerous exceptions to the general requirement to pay within two months, Sunoco has been unable to implement a system to automatically and accurately determine whether a payment is untimely under the PRSA, whether interest is owed, and whether the rate of interest should be 6% or 12% (based on whether the delay was due to unmarketable title). However, if a payee requests interest, Sunoco will investigate the individual circumstances and pay interest if owed. It is these same complexities in the provisions of the PRSA and the individual circumstances of each suspended and late payment that warrant denial of class certification in this case.

This case is also far more complex and less suitable for certification than other "interest" cases that have been brought recently in Oklahoma against oil and gas producers by royalty owners. Because Sunoco is a *purchaser* of oil and not an oil and gas producer, 90% of Sunoco's payments are made to producers and working interest owners, and only approximately 10% of payments to royalty owners of those producers. So, many of the putative class members are not

individuals, but knowledgeable oil and gas companies and their partners.  Further, because of the

large number of producers from which Sunoco purchases oil, there is far more variety in the

individual circumstances of payments than is the case for a single producer defendant that pays its

own royalty owners.  Moreover, most producers and working interest owners are fully aware of

the interest provisions of the PRSA but do not require Sunoco to  pay interest on late payments.

This is so because those payments may fall within various exceptions to the PRSA or because

payments that are technically "late" are the fault of the producers themselves, for example by

providing untimely or inaccurate payment information to Sunoco.

    Plaintiff Perry Cline alleges that he received untimely royalty payments from Sunoco for

oil proceeds from a well in which he owns a royalty interest in Oklahoma, and that Sunoco owes

him interest on alleged late payments under the PRSA.  Doc. 2-2.  Sunoco has actually tendered

payment in full to Cline of interest on the oil proceeds that Cline alleges were late.  Plaintiff also

purports to sue on behalf of a putative class of "thousands" of payees he alleges received untimely

oil and gas payments from Sunoco, and which payments he alleges did not include interest.  *Id*.

Sunoco vigorously maintains that class certification is inappropriate here; federal courts have often

refused to certify classes of royalty owners claiming underpayment of royalties.[1]  Since the

Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011), few contested

royalty classes have been certified, and most certifications have been agreed settlement classes

---

[1] *See, e.g.*, *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc*., 725 F.3d 1213, 1218-
1220 (10th Cir. 2013) (vacating the district court's order certifying a class of Kansas royalty
owners); *Chieftain Royalty Co. v. XTO Energy, Inc*., 528 F. App'x 938 (10th Cir. 2013) (vacating
the district court's order certifying a class of Oklahoma royalty owners consistent with its opinion
in *Roderick*); *McKnight v. Linn Operating, Inc*., 2016 WL 756541 (W.D. Okla. Feb. 25, 2016)
(denying certification of Oklahoma class of royalty owners); *Seeligson v. Devon Energy Prod. Co*,
2019 WL 852060 (5th Cir. 2019) (reversing royalty class certification); *EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014) (reversing certification of Virginia royalty class).

which are governed by different standards.[2]  No *contested* class certification has been ordered in

any "interest" case under the PRSA.  This Court should not be the first to do so.

## II.      BACKGROUND

### A.      Sunoco's Payments of Oil and Gas Proceeds.

#### 1.      Sunoco Purchases from Producers and Makes Payments to Producers and Royalty Owners of Some Producers.

Sunoco is in the business of buying and selling crude oil.  Ex. C at ¶ 4.  Sunoco primarily

purchases crude oil produced in the field from oil and gas producers, collects and transports the

oil to downstream locations, and then resells the oil to refineries and others.  *Id.*  Sunoco is not

itself an oil and gas producer, but rather contracts with producers to purchase oil.  *Id.*  Sunoco has

contracts with thousands of producers in Oklahoma.  *Id.*

Sunoco's payment of the proceeds for the purchase of the oil is accomplished in a variety

of ways.  Sometimes Sunoco pays 100% of the proceeds to the producer/operator, which in turn

distributes the proceeds to its partners (other working interest owners) and to overriding royalty

---

[2] Federal courts recognize that an agreed settlement class is much easier to approve than a contested class where the claims of all class members will ultimately be tried.  For example, "manageability" under Rule 23(b)(3) is quite different for a settlement class where all that is done is mail out checks, compared to a class where each claim is tried.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("[A] district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial."); *In re Am. Intern. Group, Inc. Sec. Litig.*, 689 F.3d 229, 241 (2d Cir. 2012) ("[W]ith a settlement class, the manageability concerns posed by numerous individual questions of reliance disappear."); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 335 (3d Cir. 2011) (Scirica, J., concurring) ("[S]ome inquiries essential to litigation class certification are no longer problematic in the settlement context.  A key question in a litigation class action is manageability—how the case will or can be tried, and whether there are questions of fact or law that are capable of common proof.  But the settlement class presents no management problems because the case will not be tried."); 2 *Newberg on Class Actions* § 4:63 (5th ed.) ("[I]n settlement class actions, because manageability need not be a concern, predominance—the main focus of manageability—recedes in importance as well. . . .  Courts therefore regularly certify settlement classes that might not have been certifiable for trial purposes because of manageability concerns.").

and royalty interest owners. *Id.* at ¶ 5. At other times, Sunoco agrees in its oil purchase contract to distribute the proceeds to all interest owners in the wells covered by the contract, including all working interest owners and all royalty owners. *Id.* Sunoco has a record of 23,172 unique Oklahoma properties since 2007 from which it purchased oil, and Sunoco managed approximately 164,310 payees on Oklahoma properties during the same time. *Id.* Sunoco maintains a division order file on almost every property, or well/tank, from which it purchases oil, which consists of scanned hard copy documents. *Id.*

2.    **Sunoco Uses Division Orders to Ensure the Right Payee Is Paid Properly.**

Sunoco follows industry practice in the use of division orders to confirm the accuracy of payments. Ex. C at ¶ 7. In the typical situation, when a producer drills a new well, the producer will provide a Division Order Title Opinion ("DOTO") to Sunoco to identify all interest owners in a well to which Sunoco will distribute payment. *Id.* When Sunoco starts buying oil from an already-producing well, the producer usually provides its current "paydeck" for the well. *Id.* Sunoco is dependent upon the producer to provide that information before it can make any payments. *Id.* But often the paydecks are outdated or the title information incomplete. *Id.* So Sunoco, like virtually every other payor in the industry in Oklahoma and in every state, sends division orders to every interest owner to confirm the correct name, address, and decimal interest of the payee, and to confirm (or in many cases obtain) the correct Social Security number or tax ID number of the payee. *Id.* Sunoco's goal, like all payors, is to ensure that the right person at the right address receives the right percentage share of the oil and gas production. *Id.*

Although Sunoco does not require payees to sign a Division Order as a prerequisite to payment, Sunoco does prefer to get some confirmation from the interest owner of the information provided to Sunoco by the operator of the well. Ex. A at ¶ 3. Most payees sign the division order

and return it to Sunoco, confirming the accuracy of that information as to that payee (or making any necessary corrections). Ex. C at ¶ 8. However, some division orders are returned by the U.S.P.S. as "addressee undeliverable" or the like. *Id.* Some division orders are never returned without any explanation from the payee. In a few instances, such as Plaintiff Perry Cline, a payee will ignore the initial division orders sent to him, but at some point in time may state that he refuses to sign a division order for one reason or another. *Id.* When Sunoco does not have a signed division order, it sometimes places that particular payee's interest in "suspense" until the problem can be identified and resolved. *Id.* But Sunoco places an owner in a pay status of "pay without division order" any time the payee declines to sign a division order and informs Sunoco of such. *Id.* Sunoco may also place an owner in pay status without a division order if there is enough information provided by a paydeck, although actual confirmation is preferred. *Id.* In such an instance, Sunoco pays even without a signed division order if it has at least minimal information necessary to make the payment, including a tax ID number. *Id.*

Until Sunoco has verified complete and correct information for each property and each payee, the proceeds are placed in suspense either for the entire property or for a specific payee or both. *Id.* at ¶ 9. Sunoco utilizes various codes that in general describe the reasons why a property or an individual payee is in suspense. *Id.*

### 3.    The *Hull* Decision Does Not Render Sunoco's Use of Division Orders Illegal.

Plaintiff cites *Hull v. Sun Refining & Mktg. Co.*, 1989 OK 168, ¶ 9, 789 P.2d 1272, 1277, claiming that it makes it illegal for Sunoco to suspend royalty payments to owners that do not sign division orders. Motion at 9. Plaintiff is entirely wrong. First, the court in *Hull* was applying a 1985 statute that preceded the PRSA. Crucially, this statute was amended in 1989 to approve first purchasers asking payees to execute division orders prior to receiving proceeds payments. *This*

*amendment necessarily limited the application of* Hull *to the time period 1985-1989.* 789 P.2d at
1277 n.7. This was expressly recognized in the dissenting opinion, which recognized that the
majority opinion would not apply after July 1, 1989, when the "[t]he new 1989 amendment to §
540, 52 O.S. Supp. 1989, § 540(B)," which "explicitly provides for the execution of division orders
as a prerequisite for payment to royalty owners," took effect. *See id.* at 1281 (Simms, J.,
dissenting). Notably, § 540(B) is still the law of Oklahoma, now codified as 52 O.S. § 570.11.
Thus, Plaintiff's reliance on *Hull* is entirely misplaced.

Second, Plaintiff misstates Sunoco's actual practice. As discussed above, although Sunoco
often places owner payments in suspense until a signed and completed division order is returned,
if the owner advises Sunoco that he simply refuses to sign a division order, Sunoco will remove
the owner from suspense and commence payments with the information available (which is exactly
what occurred in the case of Cline, although he did not advise Sunoco of his refusal until after the
initial proceeds were "late" under the PRSA). Ex. A at ¶ 4; Ex. C at ¶ 8. Moreover, in most cases
where division orders are unsigned and payments suspended, the cause is some title-related issue
not initially known, such as the wrong payee as a result of assignment or death (resulting in the
later change of the suspense code from unsigned division order to other codes). *See* Ex. C at ¶ 21.

**B.    The PRSA.**

The PRSA was first enacted in 1992 and subsequently amended in 1993, 1995, 2010, and
2018. Prior to its enactment in 1992, the same subject matter regarding payment of oil and gas
proceeds and interest was covered by predecessor statutes initially enacted in 1980 and amended
in 1985 and 1989 at 52 O.S. § 540, whose terms were significantly different from the PRSA.

Although Plaintiff's Original Petition and Motion to Certify do not indicate a start date for
the proposed class, Plaintiff's discovery requests in this case defined a "relevant time period" as
commencing July 1, 1995. Ex. B at ¶ 5. The version of the statute in effect for most of the time

period at issue (and within the five years preceding the filing of this suit in 2017) is the version of

the PRSA that will be addressed in most cases in this Response.  Ex. 35.

Although the basic payment provisions of the PRSA, 52 O.S. § 570.10, superficially appear

simple, additional provisions greatly complicate matters.  The basic requirement for payment of

oil and gas proceeds is as follows:

> B.  Except as otherwise provided in this section:
>
> 1.  Proceeds from the sale of oil or gas production from an oil or gas well shall be
> paid to persons legally entitled thereto:
>
> a.  commencing not later than six (6) months after the date of first sale, and
>
> b.  thereafter not later than the last day of the second succeeding month after the
> end of the month within which such production is sold.

52 O.S. § 570.10(B)(1).  This basic requirement is subject to various exceptions, including

"minimum pay" provisions that excuse the two-month requirement if the amounts are small (less

than $100), according to a complicated formula that, depending on the circumstances, allows

payment to be made annually or sometimes even later.  *See* 52 O.S. § 570.10(B)(3).

Although the PRSA provides the specific timetables for when oil and gas *proceeds* must

be "paid" or "remitted," the interest provisions of the statute do not specify a particular time for

the *payment* of any interest on any late payment, or require contemporaneous payment of interest,

but instead they state merely that the proceeds "shall earn interest."  52 O.S. § 570.10(D).  A 12%

or 6% interest rate applies, depending on the cause of the delay.  The lower rate applies when the

payment was late because title thereto is "not marketable."  52 O.S. § 570.10(D)(2).  As it turns

out, title issues are often the reason why Sunoco and other companies hold proceeds in suspense,

and they can take many years to resolve.  *See* Ex. C at ¶ 21.  The PRSA provides that

"[m]arketability of title shall be determined in accordance with the title examination standards of

the Oklahoma Bar Association."  52 O.S. § 570.10(D)(2).  These standards cover the waterfront

of title issues that may arise, particularly with respect to title to mineral interests.  The standards are Exhibit 36 in the Appendix.  The definition of marketable title is contained in § 1.1 of the Title Standards:  "A marketable title is one free from apparent defects, grave doubts and litigious uncertainty, and consist of both legal and equitable title fairly deducible of record."

Liability for interest is also allocated by the PRSA among various parties, not limited to the first purchaser (Sunoco).  Section 570.10(E)(1) provides that "[w]hen two or more persons fail to remit within such time limitations, liability for such interest shall be shared by those persons holding said proceeds in proportion to the time each person held such proceeds."  52 O.S. § 570.10(E)(1).  *See also id.* § 570.10(E)(2)(d) (same).

Finally, the PRSA expressly imposes liability on whatever party causes an incorrect royalty payment to be made, often corrected by later adjustments called prior period adjustments (PPAs). Section 570.10(C)(4) provides as follows:  "Where royalty proceeds are paid incorrectly as a result of an error or omission, the party whose error or omission caused the incorrect royalty payments shall be liable for the additional royalty proceeds on such production and all resulting costs or damages incurred by the party making the incorrect payment."  52 O.S. § 570.10(C)(4).

## C.      **Sunoco Almost Always Pays Timely, if Not *Early*.**

Historically, Sunoco has been able to make almost all payments of proceeds within the two months following production and sale of oil to Sunoco.  Ex. C at ¶ 11.  In fact, Sunoco's computer systems are set up to make payments *one month* after the month the oil is sold to Sunoco.  *Id.* at ¶ 10.  Thus, Sunoco actually pays early, even though it might gain financially from waiting to pay until the second month after the month of sale, as the PRSA would allow.  52 O.S. § 570.10(B)(1).

More than **98%** of the money paid by Sunoco to interest owners on Oklahoma production from July 2007 to October 2018 (about $12 billion) has been paid to interest owners within two months after the month of production and sale to Sunoco.  Ex. C at ¶ 11. But for a variety of

reasons—including title issues, the minimum pay threshold, later prior period adjustments—some payments are not made within two months of the month of production and sale. *Id.* These relatively rare and anomalous situations are the subject of this lawsuit.

### D.    Sunoco's Interest Payment Practices Focus on Determining Whether Interest Is Due in Each Individual Circumstance.

Provisions of the PRSA provide for interest to be earned on payments of proceeds made later than the time periods set out in the PRSA.  Since the late 1980s, Sunoco has understood, consistent with the general understanding of others in the oil and gas industry, that the PRSA does not contain a specific provision regarding when interest should be paid.  Ex. C at ¶ 12.  Instead, the Oklahoma PRSA provides only that proceeds not timely paid "shall earn" interest, and that a first purchaser who fails to remit proceeds within the statutory time limitations "shall be liable to such owners for interest."  52 O.S. §§ 570.10(D)(1), (E)(1).  This language is very different from the PRSA provisions that set out the requirement that proceeds from the sale of oil "shall be paid" within certain time periods.  *See id.* §570.10(B)(1).  Sunoco was aware of nothing in the PRSA requiring interest to be paid at the same time proceeds are paid.  Ex. C at ¶ 12.

As a practical matter, it would be impossible to determine liability for interest, determine the proper statutory rate (6% or 12%), and calculate and pay interest accurately and automatically at the same time the actual proceeds are automatically distributed.  *Id.*  There are simply too many factors and considerations and exceptions that must go into the analysis of the PRSA provisions.[3] *Id.*  Therefore, it has been Sunoco's practice, consistent with the customary practice throughout

---

[3] Were Sunoco, for instance, to program its computers to calculate and pay interest automatically for every payment of proceeds that occurs more than two months after the production sales month, at 12% interest, Sunoco would be paying interest in most cases to persons who are not entitled to such interest under the various exceptions to the PRSA (including minimum pay) and would be overpaying interest to even those persons who were entitled to interest but only at the 6% rate.  Ex. C at ¶ 13.

the oil and gas industry, not to pay interest on "late" payments at the time of the "late" payment. *Id.* Instead, it has often (but not always) been Sunoco's practice to await a request for interest from any payee who believes it is entitled to it. *Id.* at ¶¶ 12-13. When a request is made, Sunoco will investigate the accounting data and division order file, attempting to determine whether interest was due and what the cause was for the delay. *Id.* at ¶ 12. If Sunoco concludes that interest is due, then it will calculate the interest earned as provided in the PRSA (making sure to apply the correct interest rate) and pay it to the requesting party. *Id.* In his declaration, Sunoco's Eric Koelling explains the many individual factors that Sunoco must investigate and consider in each instance to determine whether a payment is "late" under the PRSA, whether interest is owed, and if so, by whom and how much. *Id.* at ¶¶ 18-36.

Most payments by Sunoco are to working interest owners (including the producer operating the well), not royalty owners. *Id.* at ¶ 14. Most or all of those working interest owners are or should be familiar with the PRSA and its interest provisions. *Id.* Many royalty owners are also familiar with the PRSA, as shown by the fact that about 300 of them made a written request for interest to Sunoco during the five years preceding this suit. *Id.*

**E.    The Oklahoma Supreme Court Has Not Declared Sunoco's "Business Policy" to Be "Unlawful."**

Citing *Pummill v. Hancock Exploration LLC*, 2014 OK 97, 341 P.3d 69, Plaintiff claims that "the Oklahoma Supreme Court has addressed [Sunoco's] business policy [regarding interest] and declared it unlawful." Motion at 8. That is utterly false. Sunoco was not even a party to *Pummill*. Moreover, the case primarily involved the calculation and alleged underpayment of royalties. The issue of whether interest must be paid even without a demand, though technically in the case, was never contested on the merits at any level in *Pummill*, and was not even identified

as an issue on appeal to the Oklahoma Supreme Court.[4]   In fact, when it vacated the opinion of the

court of appeals (which had affirmed summary judgment in the trial court on all issues), the

Supreme Court specifically stated that "[t]he parties at the oral argument *affirmed that Issue IV*

[regarding the trial court ruling on interest] *was not contested*."   *Pummill*, 341 P.3d 69 (Corrected

Order) (emphasis added).   It is misleading for Plaintiff to claim that the Oklahoma Supreme Court

"addressed" the issue, when all the Court did was affirm that the issue was not contested.   *Id.*

Plaintiff also wrongly relies on one sentence of the "Background" procedural history

recitation in a second court of appeals opinion in *Pummill*, which followed remand from the

Supreme Court and trial of other issues.   This second opinion has no precedential effect,[5] and did

not even address interest (royalty underpayment claims were at issue in that appeal).   Moreover,

the opinion expressly acknowledged that even in the trial court, the issue regarding interest "was

not disputed."   *See* Ex. 10 to Motion, at 8.

Thus, the appellate decisions in *Pummill* simply do not support Plaintiff's position.   In

reality, by citing *Pummill*, Plaintiff is relying on nothing more than a summary judgment holding

by a county district court on an uncontested issue.   Notably, Plaintiff can cite no appellate court

that has even referenced any of the *Pummill* decisions on the issue of statutory interest.

Plaintiff also fails to cite any authority for his incorrect claim that "even without *Pummill*"

---

[4] In the trial court in *Pummill*, the defendants did not challenge the plaintiff's "interest without demand" summary judgment issue IV on the merits.   Instead, the defendants argued that there was a lack of a "justiciable controversy" on the issue.   *See* Ex. 76 at 41-45.   The defendants never contested the trial court's Order as to interest (Issue 4) on appeal either.   *See* Ex. 77 (Petition in Error to Oklahoma Supreme Court) at Ex. C thereto; Ex. 78 (Petition for Writ of Certiorari in Oklahoma Supreme Court) at 1-2.   Thus, the issue of whether interest must be paid before or without a request for it was never briefed or argued in *Pummill*.

[5] The opinion was not approved for publication by the Oklahoma Supreme Court and thus has no precedential effect.   Sup. Ct. R. 1.200(d)(2).   As mentioned, the first court of appeals decision was "vacated" in its entirety by the Oklahoma Supreme Court.   *Pummill*, 2014 Ok 97, 341 P.3d 69.

a demand for interest requirement is in "clear derogation of the PRSA's plain language."  *See*

Motion at 8 n.3.  As discussed above, the statute does not expressly require *payment* of interest at

the time proceeds are paid late; instead, the statute merely specifies that proceeds "shall earn

interest."  *See* 52 O.S. § 570.10(D)(1).  Moreover, the drafters of the PRSA certainly understood

how to use the words "shall be paid," *see id.* § 570.10(B), but they did not use those words in

connection with the interest provision, nor specify a time for payment of interest.

### F.    Sunoco's Accounting Data Is Not Capable of Identifying All Class Members, and Sunoco Did Not Admit That.

Contrary to Plaintiff's contention (Motion at 12), Defendants did not admit that their

accounting data alone provides sufficient information to identify members of the proposed class,

owners who received "Untimely Payments."  Plaintiff cites Defendant's Answer to Interrogatory

No. 2, but Defendants' Amended Answer to Plaintiff's Interrogatory No. 2 clarifies that

Defendants produced accounting data from which the answer to Interrogatory No. 2 "may *in part*

be ascertained or derived . . . ."  Ex. 3 (emphasis added).[6]  Likewise, when questioned about the

original answer to Interrogatory No. 2, Sunoco's Eric Koelling stated that "additional information

might be needed," including information concerning the "circumstances of the payment."  Ex. 6

at 176-177.  Sunoco's expert Eric Krause also testified that "the accounting data itself will not

entirely determine the answer to Interrogatory No. 2, but only in part" and that accounting data is

not "all that's necessary" to identify class members.  Ex. 15 at 209.

In any event, it is well-settled that "interrogatory responses are not binding judicial

---

[6] The Amended Interrogatory Answers indicate that they were verified and served on March 19,
2019.  Ex. 3.  Although, Plaintiff's counsel claims they "have not been able to locate a record" of
the Amended Answers, Motion at 11 n.7, they were certainly aware of the amended answer to
Interrogatory No. 2, as it was read into the record during questioning at the April 11, 2019
deposition of Sunoco's expert Eric Krause.  Ex. 15. at 208-209.

admissions." *Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 527 n.21 (5th Cir. 2010); *accord Ray v. J.C. Penney Co.*, 274 F.2d 519, 521 (10th Cir. 1959) (refusing to allow an earlier interrogatory answer to stand because to do so "would have resulted in the perversion of the object of a trial which is, and always must be, to establish the truth."). Accordingly, Plaintiff's attempt to twist Defendants' original interrogatory answer into some type of judicial admission fails.

### G. The Unique Circumstances of Late Payments to Perry Cline and Sunoco's Payment of Interest to Him.

Sunoco is the first purchaser of oil from three Oklahoma wells in which the named Plaintiff Perry Cline owns an interest. Ex. A at ¶ 2. Sunoco has no record that Perry Cline or his representatives ever requested interest on any late payments of proceeds prior to his filing this lawsuit in 2017. *Id.* When it learned of this lawsuit, Sunoco undertook to investigate whether Cline may be owed interest. *Id.*

Sunoco determined that Cline had in fact been paid later than the six months allowed by the PRSA for new wells. *Id.* at ¶¶ 3-6. For the first two wells, Cline was paid "late" because he did not sign and return division orders or timely provide a signed W-9 form. *Id.* at ¶¶ 3-4. Sunoco did not hear from Perry Cline or his attorney at all in response to Sunoco's sending division orders to him until it was too late to meet the six-month deadline. *Id.* at ¶ 4. Perry Cline's lawyer, Tina Walker, finally contacted Sunoco by email and informed Sunoco that Perry Cline would not be signing Sunoco's division order, and requested that Perry Cline be put in pay status. *Id.*; Ex. 27. After Sunoco received a W-9 form signed by Perry Cline (Ex. 29), it paid Cline his accumulated proceeds.[7] Ex. A at ¶ 4. Had Perry Cline or his lawyer contacted Sunoco earlier, after receiving any one of the division orders sent to him, to advise he would not sign the division orders and to

---

[7] A similar scenario played out with respect to the third well, with Cline and his lawyer not responding at all to division orders sent by Sunoco. Ex. A at ¶¶ 5-6.

- 13 -

provide a signed W-9 form, Sunoco would have placed Perry Cline in pay status and timely paid

him proceeds within six months of the first sale of production from the wells. *Id.*

On December 19, 2017, Sunoco sent Perry Cline a check for $1,886.54, representing more

than the amount of interest owed to him for the proceeds from the three wells not paid prior to the

end of the applicable time periods provided in the PRSA.  Ex. A at ¶¶ 7-9.  The check was

accompanied by a letter explaining the calculations (and date ranges of interest payment), with a

copy to Cline's counsel of record.  *Id.* at ¶ 8; Ex. 1.  As stated in the letter, the payment was and is

unconditional.  Ex. 1.  Based on this payment, Sunoco has filed a motion to dismiss for lack of

subject matter jurisdiction based on mootness.  Doc. 103.

If Perry Cline or his representatives had contacted Sunoco to request interest instead of

filing a lawsuit, Sunoco would have investigated the circumstances and paid him.  Ex. A at ¶ 10.

### H.    Plaintiff's Proposed Class Definition.

The class definition in Plaintiff's Motion is identical to the class definition in Plaintiff's

Original Petition (Doc. 2-2 at ¶21.)  The Motion proposes to certify the following class:

> All non-excluded persons or entities who: (1) received Untimely Payments from
> Defendants (or Defendants' designees) for O&G Proceeds from Oklahoma Wells;
> and (2) whose payments did not include the statutory interest.

As in his petition, Plaintiff proposes only the following exclusions from the class:  instrumentalities

of the United States and the state of Oklahoma, "publically traded oil and gas companies and their

affiliates," persons that Plaintiff's counsel may be prohibited by ethics rules from representing,

and officers of the court.  Motion at 24.

The class definition does not on its face define the capitalized terms included in the

definition.  Plaintiff presumably intends to use the definitions in his Original Petition.  The petition

defines "O&G Proceeds" as "oil and gas production proceeds."  Doc. 2-2 at ¶ 1.  The petition

defines "Untimely Payments" as payments not in compliance with the PRSA, and specifically

"proceeds from the sale of oil or gas production or some portion of such proceeds [that] are not paid prior to the end of the applicable time periods provided" by the PRSA.  *Id.* at ¶ 5.

Because of the many facets and exceptions in the statute, determining what payments are "untimely" in violation of the PRSA is not a simple task.  Plaintiff has retained an accountant, Barbara A. Ley, to attempt to do so using Sunoco's payment history data.  In an apparent concession of the intractable difficulty of identifying "Untimely Payments" (and thus class members), Ley has announced that certain categories of payments by Sunoco are, or will be, "exclude[ed]" from her "methodology for identifying class members and for calculating class damages." Ley Rebuttal Report (Ex. 16 to Motion) at 3 n.3.  These include:  (i) all gas purchases; (ii) minimum pay; (iii) prior period adjustments; and (iv) pass-through payments.  *Id.*  In her Rebuttal Report, Ley further stated that Plaintiff's counsel had "instructed" her to exclude these transactions, and that she understood that "Plaintiff intends to clarify the nature of his asserted class claims through and amended definition of 'Untimely Payments' and/or an amended class definition." *Id.*

Plaintiff has not actually done so.  Indeed, Plaintiff's Motion makes no changes whatsoever to the original claims and class definition contained in the Original Petition (Doc. 2.2).  Thus, Sunoco can only assume that Plaintiff's counsel changed their minds between the time of the Ley Rebuttal Report and the filing of the Motion.  Certainly, Sunoco and this Court must assess the class certification issue based upon the claims actually asserted in the live petition and the class definition contained in the petition and motion to certify.  Neither Sunoco nor the Court can rely upon the statements or predictions by Plaintiff's expert about what the claims are and what the class is, when those statements are at odds with the formal position taken by Plaintiff in his filings.

It is also possible that Plaintiff's counsel is simply engaged in litigation gamesmanship.

Perhaps counsel means to induce Sunoco into not addressing the claims Ley says will be dropped. Or perhaps counsel is waiting to drop those claims in the reply brief, so as to force Sunoco expend resources and space responding to them here.   This court should not countenance this gamesmanship.  Plaintiff should be estopped from attempting to drop claims and redefine the class after the filing of the Motion, upon which Sunoco must necessarily rely in preparing its response. *See, e.g.*, *Polo v. Goodings Supermarkets, Inc.*, 232 F.R.D. 399, 409 (M.D. Fla. 2004) (refusing to certify revised class definition proposed for first time in reply brief).

## III.   STANDARD OF REVIEW

A party seeking certification of a class must clear several hurdles.  As an initial matter, he must demonstrate that each of the class prerequisites under Rule 23(a) are satisfied:

(1)   the class is so numerous that **joinder** of all members is impracticable;

(2)   there are questions of law or fact **common** to the class;

(3)   the claims or defenses of the representative parties are **typical** of the claims or defenses of the class; and

(4)   the representative parties will fairly and **adequately** protect the interests of the class.

Fed. R. Civ. P. 23(a).

Next, he must demonstrate that the proposed class comes within at least one of the provisions of Rule 23(b).  Here, Plaintiff relies on Rule 23(b)(3), which applies when "the court finds that the questions of law or fact common to class members **predominate** over any questions affecting only individual members, and that a class action is **superior** to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3) (emphasis added).

A party seeking certification under Rule 23(b)(3) must also show that the class is "'currently and readily ascertainable based on objective criteria.'"  *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013).  "If class members are impossible to identify without extensive and

individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012).

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). "To come within the exception, a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23." *Id.* A party cannot justify class certification based on unsupported assertions that the proposed class meets the requirements of Rule 23. *Id.* (Rule 23 is more than "a mere pleading standard"). He must instead present "evidentiary proof" demonstrating that the requirements of Rule 23(a) and (b)(3) are met. *Id.*

The United States Supreme Court "ha[s] emphasized that … certification is proper only if 'the trial court is satisfied, ***after a rigorous analysis***, that the prerequisites of Rule 23(a) have been satisfied.'" *Id.* (emphasis added). *See also Harper v. C.R. England, Inc.*, 746 F. App'x 712, 719 (10th Cir. 2018); *Shook v. El Paso County*, 386 F.3d 963, 971 (10th Cir. 2004) (The court must "carefully apply the requirements of Rule 23(a).").

The same principles apply to a court's consideration under Rule 23(b)(3). "If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 133 S.Ct. at 1432. Because Rule 23(b)(3) "is designed for situations in which class-action treatment is not as clearly called for," the court has a "duty to take a 'close look' at whether common questions predominate over individual ones." *Id.* (internal quotations omitted).

## IV.    ARGUMENT AND AUTHORITIES

### A.    The Court Should Deny the Motion Because the Class Members Are Not Reasonably Ascertainable.

"[A]n essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria."

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-93 (3d Cir. 2012).  "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Id.* at 593.  As the Third Circuit explained, the

> ascertainability requirement serves several important objectives.  First, it eliminates serious administrative burdens that are incongruous with the efficiencies expected in a class action by insisting on the easy identification of class members.  Second, it protects absent class members by facilitating the best notice practicable under Rule 23(c)(2) in a Rule 23(b)(3) action.  Third, it protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable.

*Id.*  Accordingly, "[a]scertainability mandates a rigorous approach at the outset because of the key roles it plays as part of a Rule 23(b)(3) class action lawsuit." *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013).  "'A critical need' of the trial court *at certification*' is to determine "how the class is to be ascertained." *Id.* at 306-07 (emphasis added).

"The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Byrd v. Aaron's, Inc.*, 784 F.3d 154, 163 (3d Cir. 2015); *accord In re Cox Enterprises, Inc. Set-Top Cable Television Box Antitrust Litig.*, 2014 WL 104964, at *2 (W.D. Okla. Jan. 9, 2014) (citing *Hayes v. Wal–Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)).  "'Administrative feasibility means that identifying class members is a manageable process that does not require much, if any, individual factual inquiry.'" *Carrera*, 727 F.3d at 307-08.

As shown below, Plaintiff's proposed definition fails both prongs of the ascertainability test, which by itself warrants denial of the Motion.  *See Cole v. ASARCO, Inc.*, 256 F.R.D. 690, 696-97 (N.D. Okla. 2010) ("Absent a cognizable class, determining whether plaintiffs or the putative class satisfy the other Rule 23(a) and (b) requirements is unnecessary."); *Warnick v. Dish Network LLC,* 301 F.R.D. 551, 555 (D. Colo. 2014) (citing *Carrera* and denying class certification

for lack of ascertainability); *McKnight v. Linn Operating, Inc.*, 2016 WL 756541, at *8 (W.D. Okla. Feb. 25, 2016) ("'If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate.' That is the case here." (quoting *Marcus*)).[8]

### 1.    The Proposed Class Cannot Be Ascertained Objectively and Would Be an Impermissible Fail-Safe Class.

Plaintiff's proposed class definition would require an individualized determination of what payments were "untimely" under the PRSA, making the class not readily ascertainable. Furthermore, because a merits determination would be required to determine who is in the class, the class definition is an impermissible "fail-safe" class. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) (defining a fail-safe class as one in which qualification as a class member depends on whether that person has a valid claim).

Plaintiff defines the putative class as persons or entities (i) who "received Untimely Payments" *as determined by the PRSA*, and (ii) whose payments did not include "the statutory interest" *allegedly due therefor under the PRSA*. Doc. 2-2 at ¶¶ 5, 21. Plaintiff's proposed definition does not permit determination of putative class members at the outset, but instead requires application of the PRSA to each putative class member and every alleged untimely payment. This is improper and requires denial of the Motion.

Plaintiff's putative class definition means that class membership cannot be determined until *after* the merits of each alleged untimely payment claim is decided. Determining whether a payment was untimely under the PRSA (the first part of Plaintiff's class definition) is a multi-step

---

[8] *See also Henderson v. Trans Union LLC*, 2016 WL 2344786 (E.D. Va. 2016) (limiting class definition to avoid "mini-trials" for ascertainability); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358-60 (4th Cir. 2014) (reversing certification of Virginia royalty class as not "sufficiently ascertainable").

inquiry which cannot occur until after each alleged untimely payment, payment history, reasons for any alleged delay, and possible defenses are scrutinized.  For example, a payment that might appear untimely under the general two-month requirement of § 570.10(B)(1) might actually be timely if the payment is a release of funds that have been held in suspense under the minimum pay provisions of § 570.10(B)(3).  But whether a minimum suspense release is timely will in turn depend upon application of the complicated formula set out in § 570.10(B)(3) to individual facts, such as whether the payee requested (or was even entitled to request) annual or monthly payment of the suspense funds.  As for "statutory interest" (the second part of Plaintiff's class definition), whether it was earned even on an untimely payment can turn on whether it was another party's "error or omission" that caused the late payment (§ 570.10(C)(4)).  And so on.  Indeed, these are just a few of the individual questions that must be answered before one can determine whether any given person is even in the class.[9]  *See* Ex. C at ¶¶ 18-36 (detailing and explaining the "[m]any individual circumstances [that] impact whether a payment was 'untimely' and whether interest is earned" under the PRSA); Ex. D (same).  *They also happen to be the exact same questions the trier of fact would have to answer to adjudicate a claim under the PRSA*.

Courts have readily denied certification under these circumstances, holding that definitions such as what Plaintiff proposes would create an improper "fail-safe" class.  *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 547 (1947) (need to identify members of the class *before* a trial on the merits); *Manual for Complex Litigation* (Fourth) § 21.222 (class definitions should not

---

[9] Plaintiff contends that his retained expert Ley has developed a methodology for identifying class members without resort to individualized inquiry.  Motion at 15-16.  But as explained in Sunoco's contemporaneously-filed Motion to Exclude the Reports and Opinions of Plaintiff's Proposed Expert, Barbara A. Ley ("Defendants' Motion to Exclude Ley"), Ley's methodology is faulty and unreliable and does not demonstrate that the proposed class is readily ascertainable.  *See also* Ex. D at ¶¶ 18-20, 66-77, 83-84; Ex. 58 at ¶¶ 14-15, 122-51.

include terms that depend on resolution of the merits); *Messner*, 669 F. 3d at 825 ("[A]'fail-safe' class [is] one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim. Such a class definition is improper because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment.").[10]

Regardless of the label (whether "unascertainable" or "fail-safe"), because Plaintiff's putative class definition *requires* mini-trials and individualized inquiries, it cannot be certified.[11]

### 2. The Class Is Not Clearly Identifiable by Potential Class Members.

A class definition must be precise and objective. Moore's Federal Practice, *Class Actions*, § 23.21[3][a] n.4 (definition should avoid subjective standards). It must allow potential class members to identify themselves as members (or not) *simply by reviewing the definition.* 1 *Newberg on Class Actions* § 7:26, 139 (5th ed. 2013) ("[A clear class definition] enables potential class members to ascertain whether they are in the class.").

Plaintiff's proposed class definition fails to meet these standards. Putative class members *cannot* simply review the class definition and determine whether they are (or are not) in the proposed class. This is true because the putative class definition does not even define "Untimely Payment." But even if it were assumed to be a payment violating the PRSA, a putative class

---

[10] *See also In re Nexium Antitrust Litig.*, 777 F.3d 9, 22 (1st Cir. 2015); *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011); *Kamar v. RadioShack Corp.*, 375 F. App'x 734, 736 (9th Cir. 2010); *Byrd v. Aaron's Inc.*, 784 F.3d 154, 167 (3d Cir. 2015).

[11] Ascertaining the composition of Plaintiff's proposed putative class is additionally complicated by its unascertainable exclusions. The putative class definition excludes (1) agencies or instrumentalities of the United States or Oklahoma, (2) publicly traded oil and gas companies, and their affiliates, (3) persons Plaintiff's counsel may be prohibited from representing under Rule 1.7 of the Oklahoma Rules of Professional Conduct, and (4) officers of the court. Doc. 2-2 at ¶ 21. Even identifying those who should be excluded is an individualized, time-consuming proposition for which Plaintiff has not identified a solution. Ex. 4 at Resp. No. 3; Ex. 51 (list of "probable" exclusions).

member would be unable to determine whether an alleged payment was untimely (and whether he was entitled to "statutory interest," the other part of Plaintiff's proposed definition) absent the kind of in-depth factual and merits analysis just discussed.[12]  Thus, Plaintiff has not properly defined the putative class, and the Motion should be denied due to lack of ascertainability.

### B.    Common Questions Do Not Predominate Over Individual Questions of Law and Fact, as Required For Certification Under Rule 23(b)(3).

Besides the requirements of Rule 23(a), the key question on this class motion is whether the plaintiff can satisfy the Rule 23(b)(3) requirement that "questions of law or fact common to class members **predominate** over any questions affecting only individual class members." Fed. R. Civ. P. 23(b)(3) (emphasis added).  According to the Supreme Court, the predominance criterion "is even more demanding than [the] Rule 23(a)" prerequisites for class certification, and it obligates courts to take "a 'close look' at whether common questions predominate over individual ones." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013); *accord Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997) (the predominance criterion is "far more demanding" than Rule 23(a)'s commonality requirement).  The predominance requirement focuses "on whether essential elements of the class's claims can be proven at trial with common, as opposed to individualized, evidence." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 359 (3d Cir. 2013).  Rule 23(b)(3)'s predominance requirement "regularly presents the greatest obstacle to class

---

[12] Changing the class definition to include every individual or entity that allegedly received a *facially* untimely payment (more than 60 days after the end of the month of sale), but without properly applying the PRSA, would not solve Plaintiff's problem.  Indeed, that sort of class could not be certified because it would include a multitude of individuals who have *no claim and no standing*.  *Messner* v. *Northshore University HealthSystem*, 669 F.3d 802, 825 (7th Cir.) ("[A] class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant."); *McElhaney v. Eli Lilly & Co.*, 93 F.R.D. 875, 878 (D.S.D. 1982) ("The definition of a class cannot be so broad as to include individuals who are without standing to maintain the action on their own behalf. Each class member must have standing . . . .").

certification." *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014).

### 1.    Individual Rather Than Common Questions Predominate as to PRSA Liability.

Plaintiff greatly oversimplifies the task of determining liability under the PRSA.  In truth, the many provisions, exceptions, and cross-references within the PRSA require consideration of myriad individualized factors with respect to any given claim for interest.  Sunoco's witnesses who have experience handling such claims have uniformly attested to this, as has Sunoco's expert Eric Krause.  *See* Ex C at ¶¶ 18-36 (declaration by Sunoco's Eric Koelling explaining the many individual circumstances that Sunoco analysts consider when handling a request for interest); Ex. 7 at 229-30 (Koelling corporate representative deposition explaining same); Ex. D (declaration of Krause explaining same); Exs. 6-8, 10-13, 15 (deposition excerpts).  Below is a list of some of the individualized issues the Court would need to sort through in order to resolve a claim for interest as to any particular payment.

### i.    Six Month Grace Period.

The Court would need to determine whether a payment made more than 60 days after the end of the month of sale of production was for a "first sale" from a well, in which case Sunoco had *six months* to pay proceeds, not two months.  52 O.S. § 570.10 (B)(1)(a).  This information is not necessarily available in Sunoco's computer system because Sunoco is not always the first purchaser from a well.  Ex. C at ¶ 19.  It would require manual research and a possible inquiry to the Oklahoma Corporation Commission to determine whether any particular payment was subject to the six month grace period.  *Id.*

### ii.    Unmarketable Title – 6% Interest.

The Court would need to determine whether proceeds were suspended because the title was not marketable, in which case proceeds earn interest at a rate of 6%, not 12%.  52 O.S. § 570.10(D)(2)(a).  This determination would also require an individualized inquiry.  Ex. C at ¶¶ 20-21.  While Plaintiff's retained accountant Ley has

speculated that Sunoco's suspense codes could easily be used to identify 6% payees, they cannot. *Id.* at ¶ 21. The codes were not designed for that purpose, they are too general, and at most they serve only as possible indicators of title issues. *Id.* Sometimes they even mask title issues, since only one code can be used at a time and often there are multiple reasons a payee is in suspense. *See id.* The only way to determine conclusively whether a given payment was delayed "because the title thereto [was] not marketable" would involve a manual review of the pertinent division order file, including any relevant emails, correspondence, title opinions, division orders, and other documents, and possibly further investigation. *See id.* at ¶¶ 16, 20.

    **iii.**    **Minimum Suspense.** The Court would need to individually determine whether any payment made more than two months after the production is sold (or six months after first sale) falls within the minimum pay provisions of the PRSA, in which case interest would not be owed. Section 570.10(B)(3) has a complex set of requirements allowing proceeds to be paid annually or sometimes even later if the amounts are less than $100. Sunoco places such small amounts in "minimum suspense" until they accumulate sufficiently. Ex. C at ¶ 24. When proceeds are paid, Sunoco's computer systems do not then reflect whether the proceeds were, to that point, being held in minimum suspense. *Id.* Although Plaintiff's accountant Ley has acknowledged the need to identify and exclude these "minimum suspense" payments in her damages model, she has been unable to do so. *See* Defendants' Motion to Exclude Ley (filed contemporaneously herewith).

    **iv.**    **Waiver of Interest.** The Court would need to individually determine if there is a signed division order that expressly exempts the duty to pay interest in the event there is a marketable title issue or if a payee has otherwise agreed verbally or in writing (in a lease, division order, joint operating agreement, or oil purchase contract) that Sunoco does not have to pay interest or can pay by a different deadline. Ex. C at ¶ 25.

**v.  Pass-Through Payments.**  The Court would need to individually determine if a royalty payment made more than two months after the sale (or six months after first sale) is actually the result of another party holding the proceeds during the delay.  52 O.S. § 570.10 (E)(2)(d) (when two or more persons fail to remit, liability shall be shared by such persons in proportion to the time each person held such proceeds).  For example, producers sometimes have Sunoco distribute proceeds of payments by natural gas purchasers who purchase gas from the same wells that Sunoco purchases the oil.  Ex. C ¶ 26.  Gas purchasers often provide Sunoco proceeds to pay royalty interest owners late, and even though Sunoco distributes those funds the same month received, the payments may be more than two months after the month the natural gas is produced and sold.  *Id.*

**vi.  Prior Period Adjustments.**  The Court would need to individually determine if a royalty payment made more than two months after the sale (or six months after first sale) is actually the result of having to correct an incorrect payment caused by another's "error or omission," in which case Sunoco would not be liable for interest.  52 O.S. § 570.10(C)(4) (when royalty proceeds are paid incorrectly as a result of an error or omission, the party whose error or omission caused the incorrect payment shall be liable).  In his declaration, Sunoco's Eric Koelling provides detailed examples of such payments, which are often called "prior period adjustments." Ex. C at ¶¶ 27-34.

### 2.  Damages Are Individualized and Not Capable of Classwide Determination Using Any Classwide Methodology.

The United States Supreme Court has held that a class should not be certified under Rule 23(b)(3) unless "damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 133. S. Ct. 1426, 1433 (2013).  If a party seeking certification cannot show that damages are capable of measurement on a classwide basis, then certification should be denied because "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.*; *see also NBL Flooring, Inc. v. Trumbull Ins. Co.*, 2014 WL 615967, at *5-6 (E.D.

Pa. Feb. 12, 2014) (denying a motion to certify a class where "damages [we]re not capable of measurement on a class-wide basis"); *Folks v. State Farm Mut. Auto. Ins. Co.*, 281 F.R.D. 608, 620 (D. Colo. 2012) (denying certification of class action involving breach of contract claims when calculating damages may have required individualized analysis).

Here, with respect to damages, Plaintiff relies exclusively on his retained accountant Barbara A. Ley. Motion at 22. By separate motion filed contemporaneously herewith, Sunoco is moving to exclude the reports and opinions of Ley, which are irrelevant, incomplete, and unreliable. *See* Defendants' Motion to Exclude Ley. As shown in that motion, Ley's damages methodology is incomplete, faulty, and unreliable. *See also* Ex. D at ¶¶ 66-77; Ex. 58 at ¶¶ 122-51. The simple truth is that numerous individualized questions—e.g., was title unmarketable, is liability for interest to be proportionately shared with another—will impact the calculation of any damages, rendering class certification improper. *See O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 744-45 (5th Cir. 2003) ("Where the plaintiffs' damage claims 'focus almost entirely on facts and issues specific to individuals rather than the class as a whole,' the potential exists that the class action may 'degenerate in practice into multiple lawsuits separately tried.' In such cases, class certification is inappropriate." (internal citations omitted).

### 3. Sunoco's Pleaded Defenses Create Individual Questions of Law and Fact That Will Predominate.

Sunoco has pleaded numerous defenses to liability and damages that must be decided by the Court, likely individual to each class member's claim, that will overwhelm any common questions of law and fact. *See* Doc. 23 at ¶¶ 73-118. Although Plaintiff may have the burden of proof on some of those issues, Sunoco will have the burden on others. In either event, the pleaded issues create numerous individual issues of law and fact. *See, e.g.*, Ex. 7 at 187-303.

For example, waiver and estoppel are among the defenses pleaded by Sunoco. In *In re*

*Tulsa Energy, Inc*., 111 F.3d 88 (10th Cir. 1997), the Tenth Circuit, applying the pre-PRSA payment statute, 52 O.S. § 540, held that a division order provision that waived interest for suspended proceeds "in event of title dispute" was not against Oklahoma public policy or contrary to the Oklahoma statute.  Here, each division order with each payee in the putative class and each contract between Sunoco and the operator/producer/working interest owner must be examined for similar waiver provisions.  In fact, most of Sunoco's purchase contracts with producers, which form the basis for Sunoco's payments to those producers (which are included in the putative class and receive the lion's share of the payments) have various provisions that impose information obligations on the producer and protective terms for Sunoco in connection with distribution of oil proceeds to the producer and other payees.  *See, e.g*., Ex. C at ¶ 36; Ex. D. at ¶¶ 28-29; Ex. 58 at ¶¶ 28-34.

In addition, because the PRSA, as well as Sunoco's contracts with producers, create the likelihood of third-party liability to members of the putative class, the need to determine the liability of third parties creates numerous individual questions that threaten to overwhelm the litigation.  For instance, if the class is certified, Sunoco will have the right to bring third-party actions against hundreds and perhaps thousands of individual producers whose contracts with Sunoco require those producers to indemnify Sunoco for any liabilities Sunoco incurs in paying the royalty owners of those producers.  Ex. C at ¶ 36.  A determination of those third-party actions will require individualized inquiry into the terms of the oil purchase contracts between Sunoco and each producer (whose terms vary from producer to producer).  *Id.*  Further, the circumstances that may have resulted in a "late" payment will have to be determined royalty owner by royalty owner to assess whether the third-party producer may be required to assume or share in any liability by the terms of the PRSA, or pursuant to the contractual terms between Sunoco and the producers.

**4.    The Fraud Claim Should Not Be Certified Because of Individual Questions Including Knowledge and Reliance.**

Plaintiff purports to plead a fraud claim. Doc. 2-2 at ¶¶ 51-56. Plaintiff does not actually plead any misstatements or omissions by Sunoco, but his retained accountant Ley has opined that Sunoco's check stubs did not "directly alert" owners that interest was owed (even though the check stubs do contain the underlying sales date, which would permit anyone to conclude that interest might be owed). Ex. 15 to Motion, at ¶ 19; Ex. 14 at 152-54.

The fraud claim should not be certified for all of the reasons that the PRSA statutory claims should not be certified, including individual questions as to whether a given payment was "untimely" and whether interest was owed and at what rate. In addition, the fraud claim should not be certified because individual questions of knowledge and reliance will necessarily predominate. The element of reliance means that fraud claims are "seldom amenable to class certification." *Slapikas v. First Am. Title Ins. Co.*, 250 F.R.D. 232, 247 (W.D. Pa. 2008); *accord In re St. Jude Med., Inc.*, 522 F.3d 836, 838 (8th Cir. 2008) ("Because proof often varies among individuals concerning what representations were received, and the degree to which individual persons relied on the representations, fraud cases often are unsuitable for class treatment."); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) ("[A] fraud class action cannot be certified when individual reliance will be an issue."); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2552 n.6 (2011).

In Oklahoma, "both actual fraud and constructive fraud require detrimental reliance by the person complaining." *Howell v. Texaco Inc.*, 2004 OK 92, ¶ 32, 112 P.3d 1154, 1161. This reliance element is fatal to class certification. Plaintiff alleges that Sunoco "suppressed the fact that interest was owed to Plaintiff and the Class members" (presumably through its check stubs) Doc. 2-2 at ¶ 54. But whether the putative class members actually relied on any Sunoco check

stub to conclude that no interest was owed is necessarily an individual question.  Many payees are

producers or working interest owners who are familiar with the PRSA and could readily perceive

from Sunoco's check stubs—which, again, display the underlying sales date—whether the

payment might be late and interest owed.  *See* Ex. C at ¶ 14; Ex. 14 at 152-54.  Many royalty

owners are also familiar with the PRSA, as shown by the fact that over 300 of them made written

request for interest to Sunoco during the five years preceding suit.  Ex. C at ¶ 14.  Plaintiff Perry

Cline himself made a written request for interest to the payor of gas proceeds to him, DCP, in

March 2016.  Ex. 5.  In short, the proposed class members' reliance on Sunoco's alleged fraud of

not affirmatively announcing that "interest was owed" is an individual question that will turn on

each person or entity's knowledge of the PRSA and the right to interest, rendering certification

inappropriate.

> **5.     The Equitable Claims for Accounting and Disgorgement and
> Injunctive Relief Create Innumerable Individual Questions of
> Balancing the Equities as to Each Putative Class Member.**

Plaintiff also asserts an equitable claim for "accounting and disgorgement" and a claim for

"injunctive relief."  Doc. 2-2 at ¶¶ 58-70.  Both of these claims are equitable in nature, and as such,

raise issues of equity and balancing of equities that are necessarily individual as to each member

of the class and Sunoco's treatment of each member of the putative class.

For Plaintiff's claims for an accounting and an injunction, success on both claims is

contingent upon there being no adequate remedy at law.  *See TMBRS Prop. Holdings, LLC v.
Conte*, 2018 WL 2988663, at *1 (N.D. Okla. May 7, 2018) (accounting); *Securities and Exchange
Commission v. Gilder*, 2014 WL 1628474, at *3 (D. Colo. 2014) (injunction).  Because Plaintiff

has an adequate remedy at law under the PRSA, he cannot pursue a claim for an accounting or

injunction. 52 Okla. Stat. § 903 (PRSA is exclusive and adequate remedy).  Thus, the Court should

decline to exercise its equitable jurisdiction here, just as it did recently in another royalty class

action where PRSA and breach of contract claims provided an adequate remedy at law.  *See Reirdon v. Cimarex Energy Co.*, 2019 WL 2610115 (E.D. Okla. June 25, 2019).

But if these equitable claims somehow survive a motion for summary judgment, they cannot be tried on a classwide basis because of the individual factual circumstances—i.e., the reasons for each late payment and whether it was the fault of Sunoco—the Court would have to consider in order to weigh the equities of requiring an accounting or issuing an injunction.

### 6.    Individual Questions Should Preclude Certifying a Class Prior to the Five-Year PRSA Statute Of Limitations.

In all events, no class should be certified for "Untimely Payments" received more than five years prior to suit because of the PRSA's five-year statute of limitations and the individual questions necessary to determine whether limitations was tolled as to each putative class member. The PRSA expressly limits recovery to the five-year period prior to the filing of the action.  52 O.S. § 570.14(D).  This suit was filed on July 7, 2017, and no class can be certified for "Untimely Payments" of oil and gas proceeds made prior to July 7, 2012.  Sunoco has pleaded limitations as a defense.  Doc. 23 at ¶ 76.  In answers to contention interrogatories, Plaintiff stated that he sought to certify a class for claims from July 1, 1995, to the present.  Ex. 4 at Resp. No. 1.  Plaintiff stated that "the doctrines of equitable estoppel or tolling, the discovery rule, and/or other theories may apply to toll the running of any statute of limitations."  *Id.* at Resp. No. 2.

To toll limitations, Plaintiff must show lack of knowledge and reasonable diligence by payees for the discovery rule, and reliance for fraudulent concealment.[13]  Individual inquiry of each class member would be required to establish whether each person knew of the "lateness" of

---

[13] "Oklahoma courts follow the discovery rule, which 'allow[s] limitations in tort cases to be tolled until the injured party knows, or in the exercise of reasonable diligence, should have known of the injury.'" *Chieftain Royalty Co. v. BP Am. Prod. Co.*, 2017 WL 5012586, at *7 (E.D. Okla. Nov. 2, 2017).  "Reasonable diligence" is "a fact-based question."  *Id.*

proceeds payments from the face of the check stub information and whether each person could see

that no interest was included, and whether they were aware of the interest provisions of the PRSA.

The knowledge of each payee is an individual question of fact that should defeat certification.  In

a post-production deduction royalty class action, Judge Heaton in the Western District of

Oklahoma would only certify a class conditional on plaintiffs agreeing to limit the class to

payments in the five years before suit.  The court explained:

> If, for example, the court is required to determine when particular class members
> discovered, or should have discovered, their potential basis for their claim, that may
> impact the determinations as to predominance of common questions or of the
> superiority of a class action as a means of resolving these disputes.

*See* Order, Doc. 174, *Naylor Farms v. Chaparral Energy*, No. CIV-11-0634-HE (March 30, 2017).

This class certification limited to five years was recently affirmed.  *Naylor Farms v. Chaparral

Energy, LLC*, 923 F.3d 779 (10th Cir. 2019).  Other courts have declined to certify classes when

tolling of limitations based on the discovery rule or fraudulent concealment is alleged.[14]

### C.    The Class Action Is Not "Superior" to Individual Resolutions of the Controversy, as Required by Rule 23(b)(3).

Rule 23(b)(3) also requires "that a class action is superior to other available methods for

the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  "The rule asks us

to balance, in terms of fairness and efficiency, the merits of a class action against those of

---

[14] *See Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329, 339 (5th Cir. 2019) ("The district court did not consider the statute of limitations and tolling question in its predominance analysis, so it abused its discretion when it determined that common questions would predominate over individual issues and certified the class."); *Hall v. Burger King Corp.*, 1992 WL 372354, at *9 (S.D. Fla. Oct. 26, 1992) (denying the plaintiff's motion for class certification / "The defense of the statute of limitations raises a plethora of yet additional individual issues . . . .") & n.8 (collecting cases / "Claims of fraudulent concealment involve highly individualized questions of fact and at a minimum, the questions of exercise of due diligence and success of concealment would have to be answered on an individual basis for each class member.  Accordingly, claims of fraudulent concealment cannot properly be tried on a class-wide basis." (internal quotation marks and citations omitted)).

'alternative available methods' of adjudication."  *Georgine v. Amchem Prods.*, 83 F.3d 610, 632

(3d Cir. 1996) *aff'd sub nom.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).

The recipients of the largest payments from Sunoco are producers, working interest

owners, or very large royalty owners, all of which are capable of representing their own interests

and resolving any claims they have directly with Sunoco through requests for payment,

negotiation, or litigation.  *See* Ex. C at ¶¶ 6, 14; Ex. D at ¶ 31 (90% of money paid by Sunoco is

to working interest owners), 27 n.43 (in Ley's damages estimate, about 10% of the owners would

receive 90% of the alleged damages).  Thus, for most of the money at stake, individual actions

would be superior to any class action.  A class action has the additional drawback that any

individual recoveries will be burdened by the substantial attorney's fee reduction that Plaintiff's

lawyers are likely to seek in this case (likely between 20% and 40% of any recovery).

An important factor in determining superiority is "the likely difficulties in managing a class

action."  Fed. R. Civ. P. 23(b)(3)(D).  For all of the reasons described in detail above, this case is

not manageable on a classwide basis without trampling on the due process rights of the defendants.

A classwide trial would necessarily degenerate into countless individual mini-trials focusing on

the various individual questions applicable to each class member, making the case unmanageable.

### D.    The Prerequisites of Rule 23(a) for a Class Certification Have Not Been Satisfied.

#### 1.    The Claimed "Common" Questions of Law or Fact Will Not Generate Common Answers for All Members of the Putative Class.

To show that class certification is warranted, Plaintiff must prove that there are "questions

of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  Proving commonality requires more

than simply identifying common questions, since "'[a]ny competently crafted class complaint

literally raises common 'questions.'"  *Wal-Mart, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

"'What matters to class certification . . . is not the raising of common 'questions'—even in

droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Id.* (emphasis original).

Here, the alleged "common" questions at the center of this case—whether each class member received "Untimely Payments" and is entitled to "statutory interest"—cannot be resolved on a class-wide basis through common proof, because those questions necessarily turn on the many individualized factors discussed above. Accordingly, Plaintiff has not and cannot satisfy the commonality requirement.

### 2. The Claims and Defenses for the Named Plaintiff Perry Cline Are Not "Typical of the Claims or Defenses of the Class."

Rule 23(a)(3) requires "the claims or defenses of the representative parties [to be] typical of the claims or defenses of the class." In considering typicality, a court evaluates "whether 'the named plaintiff[s'] individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.'" *Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 185 (3d Cir. 2001).

Here, Plaintiff offers nothing but a bare assertion that he satisfies typicality. In reality, he does not. The many individualized questions that predominate as to liability and damages necessarily preclude a finding of typicality. Moreover, Plaintiff Perry Cline differs in another very important respect from the members of the putative class he purports to represent: he is not one of them. This is so because Plaintiff's proposed class definition covers only persons who did not receive payment of statutory interest. Motion at 24. As explained above, following the filing of this suit, Sunoco investigated the circumstances of the payments to Perry Cline, calculated interest, and paid Cline. *See supra* at 13-14. Cline has admitted that the amount paid to him, $1,886.54, is what he claims in damages in this lawsuit. *See* Ex. 2. Thus, Cline, *unlike* the persons he purports to represent, has received full payment. He is thus hardly "typical." *Gen. Tel. Co. of Sw. v. Falcon*,

457 U.S. 147, 156 (1982) ("We have repeatedly held that 'a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members.'").

Sunoco has filed a motion to dismiss Cline's individual claims, as well as the class claims, on the ground that Cline has no standing because his own claim is moot.  Doc. 103.  If the Court grants that motion, then this case will be at an end, and it will be unnecessary for the Court to rule on Plaintiff's Motion to Certify.  But if the court denies Sunoco's motion, then it should in any event find that Cline's claim is not "typical" of the claims of other putative class members who have *not* been paid interest for any late payments.  "A representative's individual claim must be typical of the claims of the class members he seeks to represent.  By definition, **class representatives who do not have Article III standing to pursue the class claims fail to meet the typicality requirements of Rule 23**."  *Rector v. City & County of Denver*, 348 F.3d 935, 949-50 (10th Cir. 2003) (emphasis added).

As to typicality, the Court must also consider whether the representative's interest or claims are antagonistic or adverse to those of the class.  *Cherokee Nation of Okla. v. United States*, 199 F.R.D. 357, 364 (E.D. Okla. 2001).  Here, there is a deep and significant adversity between Cline as a royalty owner and other members of the putative class who are working interest owners.  For example, Cline's class claims could trigger an obligation on behalf of many of those same working interest owners to indemnify Sunoco.  Ex. C at ¶ 36.  As a royalty owner, Cline could also have a claim for breach of lease against his own lessee, Husky Ventures, who is in the putative class.  Ex. 42.  This is the type of adversity that caused the court in *Cherokee Nation* to deny class certification.

### 3.     The Named Plaintiff Perry Cline Is Not an "Adequate" Class Representative.

Rule 23(a)(4) requires Plaintiff to prove that "the representative parties will fairly and

adequately protect the interests of the class."  This factor requires that both the named plaintiffs and their attorneys show that they "will competently, responsibly and vigorously prosecute the suit."  *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977).

As explained above in the section on typicality, Perry Cline, as a royalty owner, also has an unavoidable intra-class conflict with the producers/working interest owners/lessees in his own wells and in wells of other putative class members.  "Numerous courts have held that intraclass conflicts may negate adequacy under Rule 23(a)(4)."  *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 315 (5th Cir. 2007).  The reasoning behind that rule is straightforward: "It is axiomatic that a putative representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent."  7A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1768 at 326 (2nd ed. 1986).

## V.  CONCLUSION

For all of the foregoing reasons, if the Court does not grant Defendants' Motion to Dismiss for Lack of Jurisdiction (Doc. 103), then Defendants request that the court deny Plaintiff's Motion to Certify Class (Doc. 91).  Per the Court's Pretrial Order (Doc. 102), Sunoco believes that at an evidentiary certification hearing is not necessary because the exhibits submitted by the parties contain the necessary evidence and an evidentiary hearing would be largely duplicative.  However, Sunoco believes that a class certification hearing consisting of oral argument of counsel would be of assistance to the Court, given the complexity of the issues.[15]

---

[15] Sunoco requests that no hearing be scheduled during the timeframe of September 3-18, 2019, because of the unavailability of Sunoco's counsel.

Dated: August 14, 2019                    Mark D. Christiansen OBA # 1675
                                          **EDINGER LEONARD & BLAKLEY PLLC**
                                          6301 N. Western Avenue, Suite 250
                                          Oklahoma City, OK 73118
                                          Telephone: (405) 702-9900
                                          Fax:  (405) 605-8381
                                          mchristiansen@elbattorneys.com


                                          */s/ Daniel M. McClure*
                                          Daniel M. McClure OBA #20414
                                          dan.mcclure@nortonrosefulbright.com
                                          Kevin Yankowsky (*pro hac vice*)
                                          kevin.yankowsky@nortonrosefulbright.com
                                          Rebecca J. Cole (*pro hac vice*)
                                          rebecca.cole@nortonrosefulbright.com
                                          **NORTON ROSE FULBRIGHT US LLP**
                                          1301 McKinney, Suite 5100
                                          Houston, TX  77010-3095
                                          Telephone (713) 651-5151
                                          Fax (713) 651-5246

                                          **ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of August, 2019, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system that will send notice of electronic filing to all counsel of record, including the following:

Michael Burrage
WHITTEN BURRAGE
mburrage@whittenburragelaw.com

Bradley E. Beckworth
Jeffrey J. Angelovich
Lisa P. Baldwin
Andrew G. Pate
Trey Duck
Brooke A. Churchman
NIX, PATTERSON, LLP
bbeckworth@nixlaw.com
jangelovich@npraustin.com
lbaldwin@nixlaw.com
dpate@nixlaw.com
tduck@nixlaw.com
codyhill@nixlaw.com

Susan R. Whatley
NIX, PATTERSON, L.P.
swhatley@nixlaw.com

Patrick M. Ryan
Philip G. Whaley
Jason A. Ryan
Paula M. Jantzen
RYAN WHALEY COLDIRON JANTZEN
     PETERS & WEBBER PLLC
pryan@ryanwhaley.com
pwhaley@ryanwhaley.com
jryan@ryanwhaley.com
pjantzen@ryanwhaley.com

Lawrence R. Murphy, Jr.
LAWRENCE R. MURPHY, JR., P.C.
lmurphy@richardsconnor.com

Robert N. Barnes
Patranell Lewis
Emily Nash Kitch
BARNES & LEWIS, LLP
208 NW 60th Street
Oklahoma City, OK 73118
rbarnes@barneslewis.com

/s/ Daniel M. McClure
Daniel M. McClure